T.C. Memo. 2004-207


UNITED STATES TAX COURT


MENARD, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JOHN R. MENARD, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 673-02, 674-02.   Filed September 16, 2004.


     MI is an accrual basis taxpayer with a fiscal year
ending January 31.  S is a cash basis taxpayer who was
the president, CEO, and 89-percent shareholder of MI
during MI's TYE 1998.  S was also the sole shareholder
and president of TMI, a cash basis S corporation.  MI
and TMI have never held ownership interests in each
other.

     For TYE 1998, MI paid S compensation of
$20,642,485.  S's total compensation included an annual
bonus equal to 5 percent of MI's net income before
taxes, subject to a reimbursement agreement, which
required that S repay to MI any amount of S's
compensation disallowed by R as a deduction.  MI has
never paid dividends to its shareholders.

MI paid certain of TMI's expenses relating to TMI's operation of Indianapolis-style race cars from Feb. 1, 1997, to Jan. 31, 1999 (the TMI expenses), but had no written agreement with TMI regarding the payment and/or reimbursement of the TMI expenses. For TYE 1998 and calendar year 1998, the TMI expenses that MI paid were $6,563,548 and $5,703,251, respectively.

During 1997 and 1998, when S attended the Indy 500 and the other Indy Racing League events, S spent time talking with MI's vendors, employees, and customers. When MI staged grand openings for new stores, TMI participated by sending drivers and providing an Indy car for display. MI also worked the TMI connection into store promotional materials and sales incentives for employees.

S regularly made loans of his compensation to MI. The loans were payable on demand. In TYE 1998, MI capitalized accrued interest on the loans in the amount of $639,302 and claimed the full amount as a depreciation deduction. On Jan. 29, 1999, MI issued a check to S for the interest. S reported the interest income on his 1999 income tax return.

R determined that MI's deduction claimed for S's compensation was "unreasonable and excessive" to the extent of $19,261,609; the TMI expenses were not ordinary and necessary business expenses of MI and, therefore, not deductible; MI's payment of the TMI expenses was a constructive dividend to S; S constructively received interest income that accrued in 1998 on his loans to MI; and MI and S were liable for sec. 6662(a), I.R.C., accuracy-related penalties for negligence or disregard of rules or regulations with respect to the TMI expenses deduction, constructive dividend, and constructive receipt of interest income.

1. Held: Although the rate of return on investment generated by MI for the year at issue satisfied the independent investor test as articulated in Exacto Spring Corp. v. Commissioner, 196 F.3d 833 (7th Cir. 1999), revg. and remanding T.C. Memo. 1998-220, so that a presumption of reasonableness attached to S's compensation, sec. 1.162-7(b)(3), Income Tax Regs., provides that reasonable compensation "is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances"

and requires that we consider whether the presumption of reasonableness is rebutted by evidence that S's compensation greatly exceeded the compensation of CEOs in comparable publicly traded companies. Held, further, when compared to the compensation of CEOs of the comparison group companies, the amount of S's compensation was reasonable to the extent of $7,066,912.

Held, further, alternatively, the language in the notice of deficiency was sufficient to permit respondent to argue a portion of S's compensation was not paid for services rendered and was a disguised dividend. Held, further, petitioners were not surprised or prejudiced by respondent's disguised dividend argument. Held, further, S's compensation was not paid entirely for personal services rendered and contained a disguised dividend to the extent that it exceeded $7,066,912.

2. Held, further, MI did not pay TMI's expenses pursuant to an oral sponsorship agreement. Held, further, to the extent the TMI expenses were reasonable in amount, MI's primary motive for paying the TMI expenses was to promote MI's business, and the TMI expenses were ordinary and necessary in the furtherance or promotion of MI's business, entitling MI to a deduction under sec. 162(a), I.R.C.

3. Held, further, to the extent MI may not deduct the TMI expenses as ordinary and necessary business expenses, the TMI expenses are a constructive dividend to S, because, as TMI's president and sole shareholder, S exercised indirect control over the payments; the payments lacked a legitimate business justification; and S directly benefitted from the payments.

4. Held, further, in 1998, S constructively received the interest that accrued during MI's TYE 1998 on his loans to MI because MI set apart the accrued interest, S could have demanded payment of the interest at any time, and MI placed no substantial restrictions or limitations on S's receipt of the interest.

5. Held, further, MI and S failed to demonstrate that their accountant had necessary and accurate information for preparing their returns and, therefore, are liable for sec. 6662(a), I.R.C., accuracy-related

penalties for negligence or disregard of rules or regulations as follows:  MI is liable with respect to the TMI expenses deduction as disallowed, and S is liable with respect to the excess TMI expenses constructive dividend and the constructively received interest income.

Robert E. Dallman, Vincent J. Beres, and Robert J. Misey, Jr., for petitioners.

Christa A. Gruber, J. Paul Knap, and Michael Calabrese, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, Judge:  These cases were consolidated upon motion of the parties for purposes of trial, briefing, and opinion. Respondent determined deficiencies and section 6662(a)[1] accuracy-related penalties with respect to petitioners' income tax and, by amendment to answer, increased those deficiencies as follows:

Menard, Inc., docket No. 673-02

| TYE Jan. 31 | Deficiency | Accuracy-related penalty sec. 6662(a) |
|---|---|---|
| 1998 | $8,966,233 | $430,414 |

---

[1]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Monetary amounts are rounded to the nearest dollar.

John R. Menard, docket No. 674-02

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1998 | $4,909,407 | $981,882 |

At the close of trial, pursuant to Rule 41(b)(1), respondent moved to amend the pleadings to conform to the evidence in light of testimony revealing that petitioner Menard, Inc., paid, and claimed as a deduction, Team Menard, Inc., salaries. We granted respondent's motion. On the basis of the Rule 41(b)(1) motion and concessions of the parties,[2] respondent determined petitioners' deficiencies and section 6662(a) accuracy-related penalties as follows:

| Docket No. | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------------|-----------|----------------------------------------|
| 673-02 | $9,069,126 | $460,031 |
| 674-02 | 2,587,000 | 517,400 |

---

[2]In the stipulation of facts, the parties agreed that for petitioner Menard, Inc.'s (Menards), taxable years ending Jan. 31, 1998 (TYE 1998), and Jan. 31, 1999 (TYE 1999), and for petitioner John R. Menard's (Mr. Menard) taxable year ending Dec. 31, 1998, Menards paid $4,731,881, $3,791,202, and $3,853,251, respectively, of Team Menard, Inc.'s (TMI), expenses. Additionally, in the stipulation of facts, respondent conceded that to the extent Menards claimed deductions for TMI expenses that Menards paid during the period from Feb. 1 to Dec. 31, 1997, those amounts are not constructive dividends to Mr. Menard for his taxable year ending Dec. 31, 1998.

After further concessions,[3] the issues for decision are:

(1) Whether petitioner Menard, Inc. (Menards), is entitled to deduct $20,642,485, the total compensation paid to petitioner John R. Menard (Mr. Menard), or some lesser amount, as officer's compensation for the taxable year ending January 31, 1998 (TYE 1998);

(2) whether Menards is entitled to claim deductions under section 162 of $6,563,548 for the payment of Team Menard, Inc. (TMI), salaries and expenses during TYE 1998;

(3) whether Menards's payment of TMI's salaries and expenses during the calendar year 1998 of $5,703,251 constituted a constructive dividend to Mr. Menard for 1998;

(4) whether interest of $639,302 that accrued during 1998 on loans from Mr. Menard to Menards, but that was paid to and reported by Mr. Menard in 1999, constituted interest income constructively received in 1998; and

_____

[3]In Menards's notice of deficiency, respondent determined that (1) Menards was not entitled to a depreciation deduction of $20,213 with respect to the grading of land, and (2) Menards was not entitled to a deduction of $187,218 with respect to legal and professional fees incurred in the development or improvement of property. In the stipulation of facts, respondent conceded that Menards properly capitalized $129,129 of the legal and professional fees. On brief, petitioner conceded both issues.

Respondent also proposed adjustments to Mr. Menard's itemized deductions. The parties agree that this issue is computational.

(5) whether Menards and Mr. Menard are liable for accuracy-related penalties under section 6662(a) for negligence or disregard of rules or regulations.

FINDINGS OF FACT

Some of the facts have been stipulated. We incorporate the stipulated facts into our findings by this reference.[4] Both

_____

[4]In the stipulation of facts, petitioners objected on the basis of relevance to stipulations concerning Menards's officers' compensation for TYE 1999, TMI's involvement in the NASCAR Craftsman Truck Series in 2000, and Menards's sponsorship of a Championship Auto Racing Team (CART) driver in 1999. We sustain petitioners' objections.

In addition, in the stipulation of facts, both parties objected to the admission of several accompanying exhibits on the basis of relevance. Petitioners objected to the admission of Exhibit 36-J, TMI's 1999 income tax return; Exhibits 61-J through 64-J, documents pertaining to Menards's revolving credit program; Exhibit 65-J, a 1995-96 Indy Racing League season associate-sponsorship agreement between TMI and Green Tree Financial Corp.; and Exhibit 66-J, documents pertaining to Menards's business relationship with Stanley Tools, including mention of Stanley Tools as a TMI associate sponsor. We sustain petitioners' objections.

Respondent objected on the basis of relevance to the admission of Exhibit 17-J, to the extent that it analyzes Menards's officer compensation in years before 1991; Exhibit 75-J, drawings currently used to promote Menards's Race to Savings sale; Exhibits 78-J and 79-J, 1993 and 1997 Internal Revenue Service Information Document Requests addressed to Menards; Exhibits 80-J and 81-J, Income Tax Examination Changes for Menards's TYE 1991, TYE 1992, and TYE 1994 through TYE 1997; Exhibits 83-J through 92-J, independent auditor's reports for Menards's TYE 1972 through TYE 1991; Exhibit 106-J, to the extent it includes diagrams of Menards's store prototypes other than Prototype III; Exhibit 107-J, a memo to Glidden from Menards; Exhibits 123-J through 127-J and 129-J, magazine and online news articles about racing, printed in 1999, 2000, and 2001; and Exhibit 128-J, a complaint filed in an unrelated case in 2000 for
(continued...)

Menards's principal place of business and Mr. Menard's residence were located in Eau Claire, Wisconsin, when the petitions in these consolidated cases (hereinafter this case) were filed.

I. Menards

Menards is an accrual basis taxpayer and has a fiscal year ending January 31 for tax and financial reporting purposes. On October 15, 1998, Menards timely filed Form 1120, U.S. Corporation Income Tax Return, for TYE 1998 and reported $315,326,485 of taxable income.

A. Menards's Business In General

Menards was incorporated on February 2, 1962, in Wisconsin. Since its incorporation, Menards has been primarily engaged in the retail sale of hardware, building supplies, paint, garden equipment, and similar items. Menards has approximately 160 stores in nine Midwestern States and is one of the nation's top retail home improvement chains, third only to Home Depot and Lowe's. In TYE 1998, Menards's revenue totaled $3.42 billion.

---

[4](...continued)
breach of a CART sponsorship agreement. We overrule respondent's objections to Exhibits 126-J and 127-J, and we sustain respondent's remaining objections.

Finally, in the stipulation of facts, respondent objected on the basis of hearsay to Exhibit 120-J, the first page of an alphabetical list of auto racing sponsors, printed in 1996, and Exhibit 122-J, a Web site posting by a team called Davis & Weight Motorsports seeking primary and associate sponsors for the 2002 NASCAR Winston Cup Series season. We sustain respondent's objections. See Fed. R. Evid. 802. We also note that these documents are not relevant to this case.

B. Menards's Corporate Structure[5]

Menards has three major divisions:  Operations, manufacturing, and corporate.  All department managers, plant managers, and supervisors report to Mr. Menard and his division managers.

### 1. Operations

The operations division controls Menards's retail stores. Mr. Menard's brother, Lawrence Menard (L. Menard), serves as operations manager and oversees all aspects of the stores' operations with respect to personnel.  The merchandising department, an offshoot of the operations division, handles the stores' merchandising needs.  Edward S. Archibald, senior merchandising manager, oversees the purchasing, merchandising, and marketing of all items for resale at Menards.  Mr. Archibald's involvement in marketing includes the use of print and broadcast media for store promotions.

### 2. Manufacturing

Midwest Manufacturing (Midwest), the manufacturing division, operated eight manufacturing plants during TYE 1998.  Dennis W. Volbrecht, Midwest's general manager, oversees all departments and facilities, supervises the plant managers, and assists in the design and proposal of products.

---

[5]Unless otherwise noted, Menards's corporate structure during TYE 1998 was the same as described herein.

### 3. Corporate

The corporate division comprises, among other things, the accounting, legal, properties, construction, and store-planning departments. In the accounting department, Robert J. Norquist, corporate controller, manages all functions of the general ledger system, including the preparation of monthly financial statements. Mr. Norquist is also responsible for the fixed asset system; accounts payable; the payroll systems; tax returns for sales tax, payroll tax, and excise tax; and the day-to-day cashflow.

As head of the properties department, Marvin Prochaska is responsible for the acquisition, development, management, and disposition of real estate for Menards. Mr. Prochaska is also responsible for Menards's construction and store-planning departments. The construction department provides onsite and offsite construction management for Menards's construction projects, and store planning works with civil engineers to develop site, structural, architectural, and floor plans.

### C. Menards's Officers and Shareholders

#### 1. Officers

During TYE 1998, Menards's corporate officers were Mr. Menard, president and chief executive officer (CEO); Mr. Prochaska, vice president of real estate; Earl Rasmussen, chief financial officer and treasurer; and Chris Menard (C. Menard),

secretary.[6]  The officers received compensation for TYE 1998 in the following amounts:

| Officer | Compensation |
|---------|--------------|
| Mr. Menard | $20,642,485 |
| Mr. Prochaska | 121,307 |
| Mr. Rasmussen | 55,702 |
| Mr. C. Menard | 172,815 |

2.  Shareholders

Since the incorporation of Menards, Mr. Menard has been the controlling shareholder.  During the years at issue, Mr. Menard owned all of the class A voting stock and approximately 56 percent of the class B nonvoting stock.  Mr. Menard's family members and trusts named after him and his family members held the remaining class B shares.[7]  In all, Mr. Menard owned approximately 89 percent of Menards's voting and nonvoting stock. Menards has never paid dividends to its shareholders.

D.  Menards's Employee Compensation Plan

1.  In General

During TYE 1998, Menards provided all employees with health, 401(k), and instant profit-sharing (IPS)[8] plans.  Other than IPS

_____

[6]Chris Menard is Mr. Menard's son.  In addition to his duties as secretary, Chris Menard ran Menards's Eau Claire distribution center.

[7]The record does not indicate whether Mr. Menard was a beneficiary of any shareholder trust.

[8]Menards implemented the IPS plan in 1966.  The amount that an employee receives under the plan is a function of the
(continued...)

and Mr. Menard's bonus plan discussed, <u>infra</u>, Menards had no written bonus plan for its officers.  However, Menards's executives met with Mr. Menard to discuss performance goals and compensation.  Menards regularly paid low base salaries to executives, supplemented with large bonuses.[9]

## 2.  Mr. Menard's Compensation Plan

In addition to the forms of compensation available to all employees, Menards pays Mr. Menard an annual bonus.  Since 1973,[10] Mr. Menard has received an annual bonus equal to 5 percent of Menards's net income before taxes (the 5-percent bonus).  The 5-percent bonus is subject to the following reimbursement agreement:  In the event that the Commissioner disallows as a deduction any portion of Mr. Menard's compensation, Mr. Menard must repay to Menards the entire amount disallowed.

---

[8](...continued) company's profitability that year and the employee's tenure with Menards and ranges from 2.5 percent to 15 percent of the employee's salary.

[9]For example, in TYE 1998, Lawrence Menard (L. Menard), operations manager, received a base salary of $45,000 and a bonus of approximately $180,000.

[10]Al Pitterle, Menards's outside certified public accountant at the time, originally suggested an annual incentive bonus for Mr. Menard.  On Jan. 15, 1973, Menards's board of directors, consisting of Mr. Menard, L. Menard, and Jeffrey E. Smith, agreed that Mr. Menard's bonus should reflect his efforts to produce profits for the company.  The board instituted the 5-percent bonus at another meeting on June 6, 1973.

In a resolution effective December 20, 1996, Menards's board
of directors[11] decided that, for TYE 1998, Menards would pay Mr.
Menard a salary of $157,500 and the 5-percent bonus.  Mr.
Menard's total compensation in TYE 1998 consisted of the
following items:

| Item | Amount |
|---|---|
| Base salary (regular weekly payroll) | $62,400 |
| Base salary (paid in December) | 95,100 |
| 5-percent bonus | 17,467,800 |
| IPS | 3,017,100 |
| Christmas gift bond | 185 |
| | [1]20,642,585 |

[1]This figure contains an unreconciled difference of $100 on
Mr. Menard's 1997 Form W-2, Wage and Tax Statement.

Mr. Menard's total compensation constituted 0.6 percent of
Menards's TYE 1998 gross receipts and 5.16 percent of all other
employees' wages.

II.  Comparable Companies and Rate of Return on Investment

    A.  Compensation Paid by Comparable Publicly Traded
        Companies

For purposes of comparing Mr. Menard's compensation to CEO
compensation of publicly traded companies, the comparison group
consists of the following five publicly traded companies:  Home

---

[11]Menards's board of directors at this time consisted of Mr.
Menard, L. Menard, and Earl Rasmussen.

Depot, Kohl's, Lowe's, Staples, and Target.  For services performed in TYE 1998, the comparison group companies paid compensation to their CEOs as follows:

| Company | Compensation |
|---|---|
| Home Depot | $2,841,307 |
| Kohl's | 5,110,578 |
| Lowe's | 6,054,977 |
| Staples | 6,868,747 |
| Target | 10,479,528 |

B.  Rate of Return on Investment

For TYE 1998, the comparison group companies' and Menards's rates of return on equity[12] were as follows:

| Company | Return on Equity |
|---|---|
| Menards | 18.8% |
| Home Depot | 16.1 |
| Kohl's | 14.8 |
| Lowe's | 13.7 |
| Staples | 15.3 |
| Target | 16.7 |

III.  Mr. Menard

Mr. Menard is a cash basis taxpayer with a taxable year ending December 31.  Between March 30 and April 15, 1999, Mr. Menard timely filed Form 1040, U.S. Individual Income Tax Return, for 1998.

A.  Mr. Menard's Duties and Responsibilities at Menards

Since he founded the company, Mr. Menard has been involved in Menards's daily business affairs.  During TYE 1998, Mr. Menard

---

[12]As calculated herein, return on equity equals net income divided by shareholders' equity and multiplied by 100 percent.

worked 6 or 7 days a week for 12 to 16 hours a day and communicated with Menards's executives on a regular basis.

As CEO of Menards, Mr. Menard was responsible for all three of Menards's major divisions. Mr. Menard's direct involvement with the operations division included discussions with L. Menard about store issues, visits to Menards stores, review of customer complaints, and examination of operations division employees' reports detailing their store visit findings.

With respect to Midwest, Mr. Menard reviewed financial statements and project plans and granted final approval for any purchases of new equipment, additions of new products, changes to existing products, additions of new Midwest facilities, and changes to existing Midwest facilities. Mr. Menard worked directly with Mr. Volbrecht on these matters.

In connection with the corporate division, Mr. Menard worked with Mr. Prochaska on real estate acquisitions, dispositions, and leasing. Mr. Menard also assisted in the development of the Menards prototype stores and plans for the construction of a second distribution center.

B. Mr. Menard's Loans to Menards

As part of his personal investment strategy, Mr. Menard made loans of his compensation to Menards during TYE 1998 and 1999. The loans were evidenced by promissory notes that were payable on demand and bore interest at the short-term applicable Federal

rate. According to Menards's books and records, the shareholder loans account balances at the close of TYE 1998 and TYE 1999 were $21,057,954 and $31,217,954, respectively. Menards's financial statements indicated that Menards possessed cash and marketable securities at the close of TYE 1998 and TYE 1999 of $138,550,434 and $242,932,229, respectively.

In TYE 1998, Menards capitalized accrued interest of $639,302 on shareholder loans and claimed the full amount as a deduction on its tax return. On January 29, 1999, Menards issued to Mr. Menard a check for the interest. On his 1999 tax return, Mr. Menard reported that amount as interest income from Menards for loans outstanding as of December 31, 1998. Mr. Menard did not report any interest income from loans to Menards on his 1998 tax return.

IV. TMI

TMI is a cash basis taxpayer and has a fiscal year ending December 31 for tax and financial reporting purposes. At all relevant times, TMI was an S corporation, owned entirely by Mr. Menard. Menards and TMI have never held ownership interests in each other.

A. TMI's Business and Management

Incorporated in 1992, TMI is in the business of engineering and racing Indianapolis-style race cars (Indy cars). From 1992

until 1995, TMI was active in the United States Auto Club (USAC) and then moved to the Indy Racing League (IRL)[13] during 1996.

Although, as TMI's president, Mr. Menard made most of the major business decisions, he did not run the day-to-day operations of the company. With the exception of the latter part of 1998,[14] Larry Curry ran TMI's daily operations. Mr. Norquist, Menards's corporate controller, managed TMI's accounting functions.

B. TMI's Racing Activities in 1997 and 1998

1. Race Participation

During the 1997 and 1998 IRL racing seasons, TMI participated in 8 and 11 events, respectively, including both Indianapolis 500 (Indy 500) races. Tony Stewart and Robbie Buhl were TMI's principal drivers for those two seasons. Although TMI never won the Indy 500, Tony Stewart was the 1997 IRL champion.

For the 1997 IRL racing season, Tony Stewart drove car No. 2, referred to as "Glidden/Menard/Special", and Robbie Buhl drove car No. 3, referred to as "Quaker State/Menards/Special" or "Menard/Quaker State Special". For the 1998 IRL racing season, Tony Stewart drove car No. 1, "Glidden/Menard/Special", and

_____

[13]The Indy Racing League (IRL) holds approximately 10 races each year in the United States. The principal race is the Indianapolis 500.

[14]Tom Knapp ran TMI's day-to-day operations at the end of 1998.

Robbie Buhl drove car No. 3, "Johns Manville/Menard/Special".

During both IRL seasons, the race cars, driver uniforms, and Indy

promotional materials exhibited Menards's logo, among the logos

of several sponsors.

2. The Sponsors

In addition to Menards's involvement with TMI,[15] several

other companies sponsored TMI's race cars during the 1997 and

1998 IRL seasons. Some of TMI's written sponsorship agreements

were part of larger business arrangements that Menards had with

its suppliers. According to TMI's sponsorship income reports,

TMI received sponsorship fees from eight sponsors during both the

1997[16] and 1998[17] IRL seasons. Besides the sponsors listed on the

_____

[15]This reference with respect to Menards does not establish that a legal sponsorship agreement existed between Menards and TMI.

[16]For the 1997 IRL season, TMI's sponsorship income report listed Campbell Hausfeld, First Brands, Gilmore Enterprises, Greentree, Quaker State, Ruan, Ryobi, and Stanley Tools as sponsors. Except for Gilmore Enterprises, Menards had business relationships with all of these companies. Respectively, the 1997 listed sponsors paid sponsorship fees of $500,000; $250,000; $100,000; $500,000; $1,480,730; $11,060.49; $375,000; and $500,000. Glidden was also a sponsor for the 1997 IRL season but did not pay its $1,800,000 sponsorship fee until February 1998. TMI's sponsorship income report for the 1997 IRL season does not list Menards as a sponsor.

[17]For the 1998 IRL season, TMI's sponsorship income report listed Campbell Group (Campbell Hausfeld), First Brands, Glidden, Greentree, Moen, Quaker State, Ryobi, and Stanley Tools as sponsors. Respectively, the 1998 listed sponsors paid sponsorship fees of $500,000; $250,000; $2 million; $250,000; $500,000; $1 million; $125,000; and $650,000. TMI's sponsorship

(continued...)

reports, TMI was also sponsored by Glidden, the consumer division of ICI Paints, North America (ICI), during the 1997 IRL season and Johns Manville during the 1997 and 1998 seasons.[18]

For both 1997 and 1998, Glidden was one of TMI's main sponsors. Not only was the Glidden name included in the name of Tony Stewart's car, the Glidden logo also was prominently featured on the race car, on Mr. Stewart's uniform, and in Indy promotional materials. On occasion, before the races, Glidden executives, ICI executives, or "other customers from other divisions" had lunch or dinner with Mr. Menard. Glidden paid cash sponsorship fees of $1.8 million for 1997 and $2 million for 1998 and offered other financial support estimated to be worth $550,000, including "clothing for the pit crew, shared food expense at Indy, as well as over and above promotional support for the Indy store promotion."

_____

[17](...continued) income report for the 1998 IRL season also lists Menards as a sponsor to the extent of $45,000.

[18]Glidden was a TMI sponsor during both the 1997 and 1998 IRL seasons but did not pay for the 1997 sponsorship until 1998. As a cash basis taxpayer, TMI did not report Glidden's 1997 sponsorship fee until it was received in 1998. Although Johns Manville was not listed on the sponsorship income report for either year, its logo appeared on TMI's 1997 and 1998 race cars, and its national accounts manager, John O'Reilly, testified that Johns Manville sponsored TMI during both seasons. Accordingly, assuming that Johns Manville was a sponsor during the 1997 and 1998 IRL seasons, excluding Menards, TMI actually had 10 sponsors during the 1997 IRL season and 9 during the 1998 IRL season.

In 1997, another main TMI sponsor was Quaker State. Not only did Quaker State's name appear in the name of Robbie Buhl's car, but Quaker State was the car's primary sponsor. Quaker State received prominent logo placement on the race car, pit crew jackets, and Indy promotional materials. Quaker State paid TMI a sponsorship fee of approximately $1.5 million.

During 1998, Johns Manville was a major TMI sponsor. In addition to the Johns Manville reference in the name of Robbie Buhl's car, Johns Manville's logo appeared prominently on the race car, on Mr. Buhl's uniform, and in Indy promotional materials. Other sponsorship benefits included opportunities for Johns Manville's customers to meet Mr. Menard, the team, and the drivers; logo positioning on the driver's cars within view of the onboard camera; and use of new Johns Manville products[19] on the race car. Although Johns Manville's national account manager, John O'Reilly, testified that Johns Manville paid sponsorship fees, the record does not reveal the amount paid for either year.

C. Menards, Mr. Menard, and TMI

1. Menards's General Involvement in Motor Sports

Menards originally became involved in motor sports in 1979. From 1980 until 1992, the year of TMI's incorporation, Menards directly owned, sponsored, and raced cars. Menards was active in

[19]Johns Manville sold fiberglass insulation.

the USAC[20] and the Championship Auto Racing Team racing divisions and participated in the Indy 500.[21]  Mr. Menard viewed motor sports as a way to garner publicity for the stores, attract suppliers' attention, and distinguish Menards from its competition.[22]  On the advice of Menards's attorney, Webster Hart, over concerns about Menards's liability in the event of an injurious racing accident, Mr. Menard formed TMI in order to shield Menards from potential liability.

### 2.  Mr. Menard's Participation in Motor Sports

#### a.  Participation as a Driver

Although Mr. Menard has never personally driven Indy cars, he has participated in motor sports for some time.  In the 1980s, Mr. Menard personally drove cars in the IMSA series and the IS series and also raced gocarts.  Since the formation of TMI in 1992, Mr. Menard has personally participated in gocart racing, IS series racing, and, in the early 1990s, sports car racing.

#### b.  Indy 500

When TMI participated in the 1997 and 1998 Indy 500 races,

---

[20]Menards participated in the United States Auto Club during the following years:  1980-82, 1984, 1986-87, and 1989-92.

[21]Menards first qualified for the Indy 500 in 1981 and participated thereafter in 1982, 1984, and 1989-91.

[22]Eventually, Home Depot and Lowe's also became involved in motor sports.

Mr. Menard attended the time trials and the actual races.[23]
Typically, Mr. Menard arrived at the racing venue either the day
before or the day of the race.  On race day, both before and
after the race, Mr. Menard talked with sponsors, potential
sponsors, vendors, potential vendors, Menards employees, and
Menards customers.[24]  During the race, Mr. Menard stayed in the
pits with the team.

### c.  Other IRL Races

For IRL races other than the Indy 500, Mr. Menard usually
arrived on Saturday for the morning practice and stayed through
the race on Sunday.  At these events, Mr. Menard was with the
racing team for practice, qualifying, and the race itself but
spent the rest of his time talking with sponsors, vendors, and
Menards employees.  On occasion, if the racing venue was located
near a Menards store or a competitor's store, Mr. Menard would
visit the store.  Mr. Menard missed approximately one racing
event in each of 1997 and 1998.

### 3.  Menards's Relationship With TMI

#### a.  Payment and Deduction of TMI's Expenses

Menards paid certain of TMI's expenses relating to TMI's

---

[23]The Indy 500 time trials and races were held on separate
weekends.

[24]Other Menards executives, including L. Menard and Mr.
Archibald, engaged in business-related activities at the Indy
500.

operation of race cars from February 1, 1997, to January 31, 1999 (the TMI expenses), but had no written agreement with TMI regarding the payment and/or reimbursement of the TMI expenses. For TYE 1998 and calendar year 1998, Menards paid TMI expenses, including salaries,[25] of $6,563,548 and $5,703,251, respectively. TMI did not record in its books and records, or report on its tax return for 1998, any income as received from Menards for sponsorship fees. Although Menards claimed deductions for the TMI expenses on its tax returns for TYE 1998 and TYE 1999,[26] Menards did not identify the TMI expenses as sponsorship fees or advertising expenses.

In addition, Menards did not create or maintain separate accounts in its books and records identifying the TMI expenses as sponsorship fees or advertising expenses. Instead, Menards recorded the TMI expenses in 10 different accounts of Menards's corporate division according to expense type.[27] For example, Menards recorded amounts spent on car parts under "Repairs

---

[25]For 1997 and 1998, Menards paid TMI employee salaries of approximately $1,830,000 and $1,850,000, respectively. The two amounts do not include pension, profit-sharing, or health insurance costs.

[26]TMI did not claim the TMI expenses as deductions on its tax returns for the relevant periods.

[27]The 10 corporate accounts had the following headings: Repairs Vehicles, Minor Tools, Professional Fees, Travel, Vehicles and Equipment, Gas and Oil, Advertising, Miscellaneous, Legal, and Rental.

Vehicles" and fuel under "Gas and Oil".  Only costs directly related to advertising, such as logos placed on the cars, were recorded under "Advertising".  This method of accounting for the TMI expenses was Menards's approach to accounting for its own racing expenses prior to TMI's incorporation.

Menards also owned the racing assets used by TMI and depreciated them on its books, records, and tax returns.  TMI's assets consisted only of cash.

### b.   TMI's Connection to Menards's Business

When Menards staged grand openings for new stores, TMI participated by sending drivers and providing an Indy car for display.  During TYE 1998, Tony Stewart and Robbie Buhl made appearances at openings and signed autographs.  Menards further implemented the racing theme at store openings with a contest in which customers could register to win a mini-Indy car.[28]

Menards also worked the TMI connection into store promotional materials, particularly with respect to the annual Race to Savings sale built around the Indy 500 and Memorial Day weekend.  The ads for the Race to Savings sale featured images of TMI's Indy cars and logo, as did employees' T-shirts worn for the sale.  Customers could register to win a replica of the Indy 500 pace car.

---

[28]The mini-Indy car had 3.5 horsepower, a gasoline-powered engine, and retailed at $700 in 1997.

In addition to sales promotions, Menards used its relationship with TMI to create sales incentives for employees. For example, in 1997 and 1998, employees who met the performance requirements for the Indy 500 contest attended an Indy 500 practice where they toured the garage, the pits, and the track; had access to the hospitality area; and met with the drivers for photos and autographs.

V. Preparation of Petitioners' Tax Returns

Since 1991, Stienessen, Schlegel & Co., LLC (the accounting firm), has served as Menards's and TMI's outside accountant and Mr. Menard's personal accountant. Joseph G. Stienessen, the managing member of the accounting firm, has been a certified public accountant for approximately 30 years. For the years at issue, the accounting firm prepared petitioners' income tax returns and also prepared TMI's 1997 and 1998 income tax returns.

VI. Respondent's Determinations and Petitioners' Petitions

On October 12, 2001, respondent sent to Menards and Mr. Menard separate notices of deficiency. In the notice sent to Menards, respondent determined that (1) Menards's deduction of $20,642,485 claimed for Mr. Menard's compensation was "unreasonable and excessive"; (2) the TMI expenses were not ordinary and necessary business expenses of Menards and, therefore, not deductible; and (3) Menards was liable for a section 6662(a) accuracy-related penalty for negligence or

disregard of rules or regulations with respect to the TMI expenses deduction. In Mr. Menard's notice, respondent determined that (1) Menards's payment of the TMI expenses was a payment to Mr. Menard, or for his benefit, and constituted a constructive dividend to him; (2) Mr. Menard constructively received interest income that accrued in 1998 on his loans to Menards; and (3) Mr. Menard was liable for a section 6662(a) accuracy-related penalty for negligence or disregard of rules or regulations with respect to the TMI expenses constructive dividend and the constructive receipt of interest income.

On January 9, 2002, Menards and Mr. Menard separately filed timely petitions contesting respondent's determinations. Mr. Menard filed an amended petition on February 6, 2003.

OPINION

I. Burden of Proof

Generally, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proof. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and a taxpayer must clearly demonstrate entitlement to the claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). The Commissioner bears the burden of proof with respect to increases in deficiencies asserted in an amendment to answer. See Rule 142(a)(1).

Section 7491, which is generally effective for court proceedings arising in connection with examinations commencing after July 22, 1998, authorizes the burden of proof to be shifted to the Commissioner if certain requirements are met. Section 7491(a)(1) provides that "If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue." However, section 7491(a)(1) applies with respect to a factual issue only if the requirements of section 7491(a)(2) are satisfied. Section 7491(a)(2) requires that a taxpayer must have complied with all substantiation requirements, that a taxpayer must have maintained all records required by title 26 and must have cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews, and, if the taxpayer is a corporation, the taxpayer must satisfy the net worth requirements of section 7430(c)(4)(A)(ii).

In the instant case, petitioners did not raise the application of section 7491 with respect to any factual issue either before or during trial. In a footnote of their reply brief, petitioners asserted that they had produced credible evidence with respect to the reasonableness of the amount of the TMI expenses and that the burden of proof on that issue should

shift to respondent under section 7491. We disagree. Petitioners have not shown that they satisfied the section 7491(a)(2)(A) and (B) requirements to substantiate any item, maintain all required records, and cooperate with respondent's reasonable requests. Moreover, petitioner's untimely assertion in their reply brief has prejudiced respondent's ability to present evidence regarding whether petitioners satisfied the requirements of section 7491(a)(2). See Estate of Aronson v. Commissioner, T.C. Memo. 2003-189.

For the foregoing reasons, we conclude that section 7491(a) does not shift the burden of proof to respondent on the issue of the reasonableness of the TMI expenses.[29] Moreover, we note that we base our findings of fact on the preponderance of the evidence in the record and not upon any allocation of the burden of proof. Respondent concedes having the burden of production, pursuant to section 7491(c) with respect to Mr. Menard's liability for the section 6662(a) accuracy-related penalty.[30]

II. Deductibility of Compensation Paid to Mr. Menard

Section 162(a)(1) provides that a taxpayer may deduct as an ordinary and necessary business expense "a reasonable allowance

---

[29]Even if sec. 7491(a) operated to shift the burden of proof to respondent in this case, the record establishes facts sufficient to support our conclusions regarding the TMI issue accordingly.

[30]Sec. 7491(c) does not place the burden of production on the Commissioner when the taxpayer is a corporation.

for salaries or other compensation for personal services actually rendered".  Thus, compensation is deductible only if (1) reasonable in amount and (2) paid or incurred for services actually rendered.  See sec. 1.162-7(a), Income Tax Regs., which provides that "The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services."  Whether amounts paid as wages are reasonable compensation for services rendered is a question of fact to be decided on the basis of the facts and circumstances of each case.  Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992).

Petitioners contend that Menards is entitled to deduct the full amount of Mr. Menard's compensation as an ordinary and necessary business expense under section 162.  In contrast, respondent asserts that $19,261,609 of Mr. Menard's compensation is a disguised dividend.

A.  Scope of the Notice of Deficiency

According to petitioners, the language in the notice of deficiency explaining respondent's determination that a portion of Mr. Menard's compensation was "unreasonable and excessive" did not encompass respondent's theory that the excess compensation was a disguised dividend.  Petitioners contend that the language referred only to respondent's determination that the amount of Mr. Menard's compensation was unreasonable.  As a result,

petitioners assert, respondent's disguised dividend theory constituted a new matter, raised for the first time in respondent's trial memorandum, and surprised and prejudiced petitioners.[31]

Respondent, on the other hand, contends that the language in the notice of deficiency, though stated with "brevity", permitted respondent to rely on all theories consistent with "the Code section under which the deficiency * * * [was] determined." According to respondent, the phrase "unreasonable and excessive" clearly implies section 162(a)(1).  Respondent points to the petition's description of Mr. Menard's compensation as "an ordinary and necessary business expenditure" as evidence that Menards knew the notice implicated section 162(a)(1).

In addition, respondent cites Nor-Cal Adjusters v. Commissioner, 503 F.2d 359 (9th Cir. 1974), affg. T.C. Memo. 1971-200, in which the taxpayer raised a similar argument.  In Nor-Cal Adjusters, the notice of deficiency stated that the

---

[31]A theory constitutes a new matter if it alters the original deficiency or requires the presentation of different evidence.  Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989).  A new theory that merely clarifies or develops the original determination is not a new matter and does not shift the burden of proof to the Commissioner.  Id.; see also Shea v. Commissioner, 112 T.C. 183 (1999); Achiro v. Commissioner, 77 T.C. 881, 890 (1981).  If the Commissioner fails to notify the taxpayer in the notice of deficiency, or the pleadings, with respect to a particular theory and causes harm or prejudice to the taxpayer in the preparation of his case, the Commissioner may not rely on that theory.  William Bryen Co. v. Commissioner, 89 T.C. 689, 707 (1987).

officers' compensation was "'excessive'" and "'[exceeded] a reasonable allowance for salaries or other compensation for personal services actually rendered within the ambit of * * * [section 162].'" Id. at 361-362. The Court of Appeals for the Ninth Circuit concluded that the notice's language apprised the taxpayer of the Code section at issue, section 162, and emphasized that the test of section 162 is two-pronged, requiring that compensation be reasonable and for personal services actually rendered. Id. at 362.

Unlike the notice of deficiency at issue in Nor-Cal Adjusters, the notice in the present case did not expressly refer to section 162 or make a specific determination as to whether Mr. Menard's compensation was for personal services actually rendered. Even so, in a recent case, we indicated that respondent need not specifically state the disguised dividend theory in the notice of deficiency. In E.J. Harrison & Sons, Inc. v. Commissioner, T.C. Memo. 2003-239, the Commissioner determined that the amounts the taxpayer deducted for compensation paid to its president were "unreasonable and excessive".[32] For the first time on brief, the Commissioner argued that the disallowed amounts were a disguised dividend.

---

[32]Our opinion in E.J. Harrison & Sons, Inc. v. Commissioner, T.C. Memo. 2003-239, did not excerpt the language from the notice of deficiency that explained the Commissioner's disallowance of deductions for officer compensation.

Although the taxpayer did not contend that the disguised dividend argument constituted a new matter, citing Nor-Cal Adjusters, we noted that we would have rejected any such argument. See E.J. Harrison & Sons, Inc. v. Commissioner, supra.

We agree with respondent that the notice of deficiency was broad enough to encompass a disguised dividend theory. The phrase "unreasonable and excessive" implicitly invoked section 162(a)(1), which expressly provides that the compensation must be for personal services actually rendered. See also section 1.162-7(a), Income Tax Regs., which confirms that there is a single test for deductibility of compensation that examines whether the payments were reasonable and, in fact, were payments purely for services. Moreover, Menards's characterization in its petition of Mr. Menard's compensation as "an ordinary and necessary business expenditure", which respondent then denied in the answer, demonstrated Menards's understanding that section 162(a)(1) was involved. See Zmuda v. Commissioner, 731 F.2d 1417, 1420 (9th Cir. 1984) (taxpayer's comprehension of the theories encompassed by the notice's language was evident in the pleadings), affg. 79 T.C. 714 (1982).

For the above reasons, therefore, we conclude that the notices of deficiency were sufficient to raise both the "reasonableness" and "purely for services" prongs of the section 162 test for deductibility of the compensation at issue and that

petitioners were neither prejudiced nor surprised by respondent's argument.

B.  Reasonableness of the Amount of Compensation

1.  The Independent Investor Test

Under section 162(a)(1) the first prong of the test for the deductibility of compensation requires that the amount of compensation be reasonable.  Petitioners and respondent agree that the independent investor test of Exacto Spring Corp. v. Commissioner, 196 F.3d 833 (7th Cir. 1999), revg. Heitz v. Commissioner, T.C. Memo. 1998-220, applies to our analysis of reasonableness.  See Golsen v. Commissioner, 54 T.C. 742, 757 (1970) (holding that we must "follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone"), affd. 445 F.2d 985 (10th Cir. 1971).

In Exacto Spring Corp. the Court of Appeals for the Seventh Circuit rejected the multifactor test used by this Court and several Courts of Appeals[33] to decide whether compensation is reasonable, and, in its place, adopted the independent investor

---

[33]See, e.g., RAPCO, Inc. v. Commissioner, 85 F.3d 950 (2d Cir. 1996), affg. T.C. Memo. 1995-128; Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315 (5th Cir. 1987), affg. T.C. Memo. 1985-267; Elliotts, Inc. v. Commissioner, 716 F.2d 1241 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282; Pepsi-Cola Bottling Co. v. Commissioner, 528 F.2d 176 (10th Cir. 1975), affg. 61 T.C. 564 (1974); Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115 (6th Cir. 1949), affg. a Memorandum Opinion of this Court.

test.  Under the independent investor test as adopted by the
Court of Appeals for the Seventh Circuit, if a hypothetical
independent investor would consider the rate of return on his
investment in the taxpayer corporation "a far higher return than
* * * [he] had any reason to expect", the compensation paid to
the corporation's CEO is presumptively reasonable.  Id. at 839.
This presumption of reasonableness may be rebutted, however, if
an extraordinary event was responsible for the company's
profitability or if the executive's position was merely titular
and his job was actually performed by someone else.  Id.  On
brief, respondent conceded that Mr. Menard's compensation
satisfied the independent investor test.

Although we agree with respondent that Mr. Menard's
compensation satisfies the independent investor test as
articulated in Exacto Spring Corp., our inquiry into whether the
compensation was reasonable in amount does not end there.[34]  In

---

[34]Respondent conceded in his posttrial brief that the rate
of return generated by Menards for the TYE 1998 was sufficient to
satisfy the independent investor test and did not argue that the
presumption created thereby was rebutted by evidence that the
compensation paid to Mr. Menard was substantially and
unreasonably higher than the compensation paid to CEOs in
comparable companies.  Respondent chose instead to argue only
that the disallowed portion of Mr. Menard's compensation was a
disguised dividend.  It is within our discretion to accept or
reject a concession.  Fazi v. Commissioner, 105 T.C. 436, 444
(1995) (citing Jones v. Commissioner, 79 T.C. 668, 673 (1982),
and McGowan v. Commissioner, 67 T.C. 599, 601, 605 (1976)).  "We
may accept a concession or choose to decide the underlying
substantive issues as justice requires."  Id.  Because we believe
(continued...)

Exacto Spring Corp., the Court of Appeals for the Seventh Circuit

did not address the factual situation now before us where the

investors' rate of return on their investment generated by the

taxpayer corporation, a closely held corporation, is sufficient

to create a rebuttable presumption that the compensation paid to

the corporation's CEO is reasonable, but the compensation paid by

the taxpayer corporation to its CEO substantially exceeded the

compensation paid by comparable publicly traded corporations to

their CEOs.  We turn to the opinion of the Court of Appeals for

the Seventh Circuit in Exacto Spring Corp. for guidance.

In Exacto Spring Corp. v. Commissioner, supra at 838, the

Court of Appeals for the Seventh Circuit stated as follows:

> In the case of a publicly held company, where the
> salaries of the highest executives are fixed by a board
> of directors that those executives do not control, the
> danger of siphoning corporate earnings to executives in
> the form of salary is not acute.  The danger is much
> greater in the case of a closely held corporation, in
> which ownership and management tend to coincide;
> unfortunately, as the opinion of the Tax Court in this
> case illustrates, judges are not competent to decide
> what business executives are worth.

Implicit in the above statement is the apparent belief of the

Court of Appeals for the Seventh Circuit that compensation of a

---

[34](...continued)
that we are required by sec. 1.162-7, Income Tax Regs., to
consider evidence of how the marketplace values the services of
comparably situated executives in deciding whether the
presumption of reasonableness has been rebutted, we shall treat
respondent's concession as a concession that a presumption of
reasonableness arose and evaluate the evidence in deciding
whether Mr. Menard's compensation was reasonable.

CEO fixed by an independent board of directors of a publicly traded company is more likely than not to represent legitimate compensation established by the marketplace and not disguised dividends. Although the Court of Appeals for the Seventh Circuit made it abundantly clear in Exacto Spring Corp. that a trial court should not ordinarily second-guess a corporation's decision regarding the compensation of its CEO as long as a satisfactory rate of return on investment, adjusted for risk, is obtained for shareholders, the Court of Appeals for the Seventh Circuit did not extend the same criticism to the marketplace. In fact, the Court of Appeals for the Seventh Circuit acknowledged the reliability of compensation decisions by publicly traded corporations but apparently was not presented with, nor did it decide, whether evidence that comparable publicly traded companies paid substantially less compensation to their CEOs was sufficient to rebut the presumption of reasonableness that attaches to the compensation paid to a CEO of a closely held corporation like the one in this case.

To answer the question, we turn to section 1.162-7(b)(3), Income Tax Regs., which provides:

> In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. * * *

The Court of Appeals for the Seventh Circuit did not discuss the above-quoted regulation in Exacto Spring Corp. v. Commissioner, supra, or declare it invalid.  Neither party in this case has challenged the regulation or argued that it exceeds the Treasury's delegated authority to construe section 162.  Treasury regulations "constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons."  Commissioner v. S. Tex. Lumber Co., 333 U.S. 496, 501 (1948) (citing Fawcus Mach. Co. v. United States, 282 U.S. 375, 378 (1931)); see also Carle Found. v. United States, 611 F.2d 1192, 1196 (7th Cir. 1979) ("It is well established that the regulations must be given great weight absent a showing that they are unreasonable or inconsistent with congressional intent."); Anesthesia Serv. Med. Group, Inc. v. Commissioner, 85 T.C. 1031, 1048 (1985), affd. 825 F.2d 241 (9th Cir. 1987).  As we read section 1.162-7, Income Tax Regs., we are required to consider evidence of compensation paid to CEOs in comparable companies when such evidence is introduced to show the reasonableness or unreasonableness of a CEO's compensation. Because each of the parties offered expert testimony on the reasonableness of Mr. Menard's compensation that relied upon data from publicly traded companies that the parties agreed are comparable, we must consider such evidence in deciding whether the presumption of reasonableness that respondent has conceded

arose from Menards's rate of return on its shareholders' investment for TYE 1998 has been rebutted. Accordingly, we shall review the parties' experts' comparisons of Mr. Menard's compensation to compensation paid to CEOs by comparable publicly traded companies and consider them in deciding whether Mr. Menard's salary for 1998 was reasonable within the meaning of section 162.

## 2. Expert Reports

At trial, petitioner and respondent presented expert testimony comparing Mr. Menard's compensation with the compensation paid to CEOs in comparable companies. In reviewing the conclusions of each expert, we may accept or reject the testimony according to our own judgment, and we may be selective in deciding what parts of the experts' opinions, if any, we accept. See Parker v. Commissioner, 86 T.C. 547, 561-562 (1986).

### a. Petitioners' Expert

Petitioners' expert on valuing CEO compensation was Craig Rowley, vice president of national retail practice of Hay Group, Inc., an international management consulting firm known for compensation analysis and design.

#### (i) Comparable Companies

For purposes of comparing Mr. Menard's compensation with that of similarly situated executives, Mr. Rowley selected a comparison group of publicly traded companies that sold hard

goods products, experienced sustained sales growth and profitability between 1988 and 1998, and attained $1 billion in annual revenue by 1998. The following 12 companies met these criteria: Barnes & Noble, Best Buy, Borders, Circuit City, CVS, Home Depot, Kohl's, Lowe's, Staples, Target, Wal-Mart, and Walgreen.

### (ii) Proxy Statements

Using the comparison group companies' proxy statements filed with the Securities and Exchange Commission (SEC) for 1988 through 1998, Mr. Rowley obtained compensation data with respect to salaries, bonuses, and long-term incentives (LTI).[35] To better reflect compensation for services rendered, Mr. Rowley examined the comparable companies' proxy statements for TYE 1999 in his analysis of compensation for TYE 1998.[36] According to Mr. Rowley, companies do not make variable compensation decisions before the end of the fiscal year, and stock options shown on the proxy statements as granted in TYE 1999 actually compensated executives for services performed in TYE 1998.

---

[35]All but two of the companies in Mr. Rowley's comparison group compensated their CEOs with long-term incentives in the form of stock options and/or restricted stock awards.

[36]For comparison companies with fiscal years ending in December 1998, however, because Menards's fiscal year ended in January 1998, Mr. Rowley used the comparison companies' TYE 1998 proxy statements.

## (iii) LTI Valuation Methodology

In his analysis of the comparison group's proxy statements, Mr. Rowley used a formula for valuing LTI compensation that he referred to as the "Growth Model". According to Mr. Rowley, the Growth Model projects the actual, as opposed to the theoretical, value of LTI compensation that a CEO will receive.

Pursuant to the Growth Model, first, Mr. Rowley assumed that the stock prices would appreciate from the original grant price at a 10-percent annual rate. Mr. Rowley derived the 10-percent growth rate from an SEC proxy statement instruction, which requires that companies report the potential realizable value of stock option grants[37] at both 5-percent and 10-percent appreciation rates. See 17 C.F.R. sec. 229.402(c)(2)(vi)(A) (2004). Because the comparison group contained only high-performing companies and the stock market had a 15-percent growth rate during the period, Mr. Rowley explained, he opted for the 10-percent growth rate. Secondly, Mr. Rowley assumed that the recipient would hold the stock "for the typical 10 year term"[38] and calculated the LTI compensation value. Lastly, Mr. Rowley discounted the LTI compensation value to its present value using

[37]On their proxy statements, companies may substitute the potential realizable value of the stock option grants with the present value of the grants under any option-pricing model. See 17 C.F.R. sec. 229.402(c)(2)(vi)(B) (2004).

[38]According to Mr. Rowley, most long-term incentive stock option grants are for a period of 10 years.

the applicable Treasury rate.  Mr. Rowley did not discount for future dividend payments or the possibility that the options may not be exercised.[39]

### (iv) Mr. Rowley's Conclusion

In Mr. Rowley's opinion, after conducting a financial analysis of Menards and the comparison group companies, "a CEO of Mr. Menard's talents and results would be paid at the 90th percentile or higher."  According to the financial analysis, Menards performed in the 90th percentile with respect to its return on equity, return on assets, and return on capital and below the 10th percentile with respect to average debt.  Mr. Rowley concluded that Menards would want to reward Mr. Menard for the company's increased market share in home improvement sales[40] and high sustained earnings by compensating Mr. Menard at or above the 90th percentile.

Combining each CEO's salary, bonus, and LTI to arrive at "total direct compensation", Mr. Rowley computed 25th, 50th, 75th, and 90th percentile categories of $7,839,787, $11,496,214, $15,974,951, and $19,272,533, respectively.  According to these

---

[39]In support of his decision against discounting for dividends or forfeiture, Mr. Rowley testified that CEOs "don't think about" dividends and stay in their positions "for a long time" and hold onto their options.

[40]Mr. Rowley based his conclusion that Menards increased its market share on Menards's substantial increase in sales and multiple new store openings over the years.

numbers, Mr. Menard's compensation exceeded the 90th percentile of total direct CEO compensation for TYE 1998.[41]

### b. Respondent's Expert

Respondent's expert on valuing CEO compensation was Dr. Scott D. Hakala, principal, CBIZ Valuation Group, Inc. Dr. Hakala has testified previously before this Court as a reasonable compensation expert. See, e.g., Brewer Quality Homes, Inc. v. Commissioner, T.C. Memo. 2003-200.

### (i) Comparable Companies

For his analysis, Dr. Hakala selected a comparison group and divided it into two sets. The first set comprised the other two major home improvement retail chains, Home Depot and Lowe's, which Dr. Hakala described as "directly comparable" to Menards. The second set contained seven major retail chains with "somewhat similar operating characteristics" as Menards: Dollar General, Kohl's, May Department Stores, Office Depot, Staples, Target, and TJX.

### (ii) Proxy Statements

Instead of using TYE 1999 proxy statements for analyzing TYE 1998 compensation, Dr. Hakala extracted data from TYE 1998 proxy

---

[41]Mr. Rowley also compared Mr. Menard's compensation to 17 leading U.S. retailers using the Hay Retail Industry Senior Executive Remuneration Survey. Because petitioners failed to establish that these surveyed companies are comparable to Menards, we do not consider this portion of Mr. Rowley's analysis.

statements.  Dr. Hakala believed that the TYE 1998 proxy statements reflected compensation for services performed in TYE 1998.

### (iii) LTI Valuation Methodology

In contrast with Mr. Rowley's approach to valuing LTI compensation, Dr. Hakala used the Black-Scholes option-pricing model (Black-Scholes)[42] to determine the theoretical value of the stock options.  Both Mr. Rowley and Dr. Hakala agree that Black-Scholes is a method for valuing stock options generally accepted by valuation experts.  To arrive at the values of the stock options, Dr. Hakala considered the following five Black-Scholes variables:  (1) Underlying stock price, (2) exercise price, (3) volatility, (4) risk-free interest rate, and (5) time to expiration of the option.

After computing the Black-Scholes values of the stock options, Dr. Hakala took a 50-percent discount to arrive at a "market value".  According to Dr. Hakala, as a result of certain Black-Scholes assumptions, for example, the assumption that investors are risk-neutral, Black-Scholes artificially inflates stock option values.  In reality, Dr. Hakala explained, CEOs are risk averse and exercise their options early or, due to death, disability, retirement, resignation, or termination, forfeit

---

[42]See Black & Scholes, "The Pricing of Options and Corporate Liabilities", 81 J. Pol. Econ. 637 (1973).

their options.  Dr. Hakala also intended that the 50-percent discount account for the restriction on transferability of employee stock options.

Next, Dr. Hakala calculated a 3-year moving average of the stock options' discounted Black-Scholes values, in order to "smooth out the volatility between varying magnitudes of options awarded in different years".[43]  Dr. Hakala based his decision to use the moving average on the Financial Accounting Standards Board's Statement of Financial Accounting Standards (SFAS) No. 123.  According to Dr. Hakala, SFAS No. 123 requires proration of stock option values over the vesting period and, as a result, reflects stock option values over a continued period of performance.

### (iv) Dr. Hakala's Conclusion

In Dr. Hakala's opinion, Mr. Menard's compensation was "dramatically higher" than compensation paid to the CEOs of the comparison group companies.  Although Menards performed comparatively well with respect to growth and profit margins, in TYE 1998, Mr. Menard's compensation was, in Dr. Hakala's opinion, approximately seven times higher than the average of Home Depot's and Lowe's CEOs' compensation and significantly higher than the

---

[43]For example, when computing the value of stock options granted in TYE 1998, Dr. Hakala averaged the discounted Black-Scholes values for the stock options granted in TYE 1996, TYE 1997, and TYE 1998.

compensation paid to Target's CEO.  Accordingly, Dr. Hakala concluded that Mr. Menard's compensation was not reasonable.[44]

### 3.   The Parties' Criticisms of the Expert Reports

#### a.   Comparable Companies

Petitioners object to the inclusion in Dr. Hakala's comparison group of Dollar General, May Department Stores, Office Depot, and TJX.  Petitioners assert that those four companies did not sell hard goods products, experience sustained sales growth and profitability from 1988 through 1998, or attain $1 billion in revenue by 1998.

In criticism of petitioners' comparison group companies, at trial, respondent established that, when Mr. Rowley selected comparable companies based on sustained sales growth and profitability between 1988 and 1998, he did not make certain that the same CEO ran the comparison group companies for the entire period.  Mr. Rowley testified that he was certain only that Home Depot and Staples had the same CEO for the period but emphasized that CEO continuity was not necessary for purposes of "understanding the market".

---

[44]Dr. Hakala also compared Mr. Menard's compensation to the Watson Wyatt Executive Compensation Survey, a market survey which compiles compensation data for various industries.  Respondent has not established that the surveyed companies are comparable to Menards.  Accordingly, we reject this portion of Dr. Hakala's analysis.

b.  Proxy Statements

With respect to the proxy statements for the comparison group companies, the parties are unable to agree on the appropriate fiscal year for analyzing CEO compensation for TYE 1998.  Petitioners assert that the TYE 1999 compensation data applies, whereas respondent insists on using the TYE 1998 compensation information.

In support of their position, petitioners rely solely on the credibility of Mr. Rowley.  From his representation of retailers throughout the United States, Mr. Rowley found that most retailers compensate their CEOs for services rendered during a particular fiscal year by awarding LTI shortly after the beginning of the next fiscal year.  For this reason, Mr. Rowley assumed that compensation reported on the TYE 1999 proxy statements was awarded for TYE 1998 services and used the TYE 1999 proxy statement compensation data in his analysis of TYE 1998.

Similarly, respondent relies on the credibility of Dr. Hakala, who asserted that Mr. Rowley should have used the TYE 1998 proxy statements.  Respondent disagrees with Mr. Rowley's interpretation of the proxy statements and emphasizes that Mr. Menard's bonus for his performance during TYE 1998 was awarded to Mr. Menard in, and intended as compensation for, that year.

### c. LTI Compensation Valuation Methodology

Alleging that Dr. Hakala's valuation method, combining Black-Scholes, a 50-percent discount for risk aversion, and a 3-year moving average, was "fatally flawed" and "grossly undervalued" the LTI compensation, petitioners urge us to adopt Mr. Rowley's valuation methodology. First, petitioners assert that Black-Scholes is incapable of predicting actual gains with respect to LTI compensation and that it understates the value of stock options by placing a high premium on volatility and discounting the value of successful companies with sustained growth. Calling Dr. Hakala's use of a 50-percent discount for risk aversion "arbitrary", petitioners claim that this approach fails to differentiate between long-term CEOs and other executives. Lastly, petitioners object to Dr. Hakala's use of a 3-year moving average, arguing that it produced a significantly lower value for the LTI compensation by combining "substantially less successful" years with TYE 1998.

In contrast, respondent asserts that we should adopt Dr. Hakala's valuation methodology and entirely disregard Mr. Rowley's use of the Growth Model. At trial, Dr. Hakala testified that the Growth Model is not a generally accepted method for valuing stock options and questioned whether any valuation expert would accept Mr. Rowley's methodology.

Respondent offers several specific criticisms of Mr. Rowley's valuation method. First, respondent criticizes Mr. Rowley's failure to consider restrictions on the time before exercise of the options, arguing that this omission artificially inflated the stock options' values. Secondly, respondent challenges as unsubstantiated Mr. Rowley's assumption that the underlying stock would appreciate at an annual rate of 10 percent over a 10-year period and that the CEOs would hold the options for a full 10 years. Respondent also argues that Mr. Rowley inappropriately obtained the 10-percent appreciation rate from SEC proxy statement filing instructions that are unrelated to the valuation of stock options. Finally, respondent criticizes Mr. Rowley's methodology for refusing to take the possibility of dividends into account even though the payment of dividends decreases a corporation's value and results in a corresponding decrease in stock option value.

### 4. Analysis

#### a. Comparable Companies

Although Mr. Rowley and Dr. Hakala used several different companies in their respective comparison groups, the two experts agreed that five companies were comparable to Menards: Home Depot, Kohl's, Lowe's, Staples, and Target. On brief, respondent stated that the five companies "are probably a sufficient sample" for comparing CEO compensation. On the basis of the experts'

agreement with respect to the five companies listed above and the lack of evidence establishing that the other companies are truly comparable to Menards, we consider only CEO compensation paid by Home Depot, Kohl's, Lowe's, Staples, and Target.

b. <u>Proxy Statements</u>[45]

We disagree with petitioners' contention that the comparison group companies' TYE 1999 proxy statements reported compensation paid for TYE 1998 services.  The SEC Standard Instructions (the SEC instructions) for filing proxy statements provide that "If the CEO served in that capacity during any part of a fiscal year with respect to which information is required, information should be provided as to all of his or her compensation <u>for</u> the full fiscal year."  17 C.F.R. sec. 229.402(a)(4) (2004) (emphasis added).  Furthermore, the SEC instructions for the proxy statement's summary compensation table state that the table shall include executive compensation "<u>earned</u> by the named executive officer <u>during</u> the fiscal year covered".  17 C.F.R. sec. 229.402(b)(2)(iii) (emphasis added).  Even assuming that Mr. Rowley is correct that companies do not make their decisions with respect to bonuses and LTI compensation until a few months after the beginning of the next fiscal year, the bonuses and LTI

[45]In the past, we have permitted the use of SEC proxy statement data for the comparison of an executive's compensation to comparable companies' executives' compensation.  See <u>Square D Co. & Subs. v. Commissioner</u>, 121 T.C. 168 (2003).

intended as compensation <u>for</u> TYE 1998 would be reported on the TYE 1998 proxy statements, pursuant to the SEC instructions. Accordingly, we accept Dr. Hakala's compensation figures taken from the TYE 1998 proxy statements.

### c. <u>LTI Compensation Valuation Methodology</u>

In defense of Mr. Rowley's valuation methodology, petitioners cite articles in the American Compensation Association Journal.[46]  Though the articles lend support to the existence of Mr. Rowley's Growth Model, we are not persuaded that the model is generally accepted by valuation experts or that it provides a reasonably accurate value for the LTI compensation. Petitioners have failed to establish that Mr. Rowley's selection of a 10-year period until exercise of the options and a 10-percent growth rate was appropriate.  We find it particularly troublesome that Mr. Rowley derived the 10-percent growth rate from the SEC instructions for reporting potential realizable value of stock options.  At trial, Mr. Rowley admitted, and Dr. Hakala confirmed, that the SEC requirement is actually intended to illustrate amounts that executives can earn on stock options at a 10-percent growth rate and is not a rule for valuing stock options.

---

[46]See, e.g., Buyniski & Silver, "Determining the Compensation Value of Stock Options", 9 Am. Comp. Association J. 66 (Jan. 2000) (contrasting Black-Scholes with another model similar to Mr. Rowley's Growth Model called the Present Value of Expected Gain).

After reviewing both experts' methodologies, we conclude that Black-Scholes is a more credible stock option valuation method than the Growth Model. Unlike Mr. Rowley's Growth Model, Black-Scholes accounts for the effects of dividends and volatility on the stock options' values. Moreover, generally accepted accounting principles support the use of Black-Scholes for valuing stock options. For example, paragraph 19 of SFAS No. 123 requires for financial reporting purposes that companies use a fair value method of accounting, such as Black-Scholes, to estimate the companies' stock option expenses.[47] Furthermore, we disagree with petitioners' contention that Black-Scholes understates the options' values. Considering that Black-Scholes does not account for transfer restrictions, vesting periods, or the risk of forfeiture, Black-Scholes more likely overstates the options' values.

In support of Dr. Hakala's decision to alter the Black-Scholes value by taking a 50-percent discount for risk aversion, respondent cites articles in accounting journals that describe the valuation approach of SFAS No. 123 and discuss the prevalence and implications of forfeiture and early exercise of employee

---

[47]Paragraph 19 of SFAS No. 123 actually recommends a slightly modified version of Black-Scholes in that the SFAS No. 123 model replaces the actual-time-to-expiration variable with the expected life of the option. In paragraph 169, SFAS No. 123 explains that this substitution reflects the restrictions on transferability of employee stock options.

stock options.[48]  In addition, at trial, Dr. Hakala testified that, due to risk aversion, vesting periods, and early terminations, most executives do not wait 10 years to exercise their options and, as a result, on average, realize only one-half of the Black-Scholes value.  Dr. Hakala based this opinion on academic studies and his own personal research on insider trading and executive options.  In rebuttal, Mr. Rowley testified that, in his experience, CEOs of retail companies do not exercise their options early or allow them to lapse.

Although we find it difficult to believe, as Mr. Rowley suggests, that CEOs of retail companies never forfeit their stock options, we cannot agree with respondent that a 50-percent discount of the Black-Scholes value is appropriate.  Other than Dr. Hakala's personal observations, respondent has not introduced any evidence establishing that valuation experts would apply a discount as large as 50 percent to account for risk aversion. The articles cited by respondent do not recommend a 50-percent discount, and, in Dr. Hakala's report, he did not substantiate his choice of a 50-percent discount over other possible discounts.  Moreover, Dr. Hakala did not consider the comparison group companies' own exercise and forfeiture patterns.  Even if, as Dr. Hakala testified, employee stock options generally realize

---

[48]See, e.g., Botosan & Plumlee, "Stock Option Expense:  The Sword of Damocles Revealed", 15 Acct. Horizons 311 (Dec. 2001).

only one-half of their Black-Scholes value, here, we are not dealing with companies in general.  We are examining a group of companies that are comparable to Menards, and Dr. Hakala should have focused his valuation on those companies.  After rejecting the 50-percent discount for the foregoing reasons, the record leaves us with no alternative but to move on to our review of the 3-year moving average.

Though intended to justify the 3-year moving average, Dr. Hakala's report and trial testimony establish only that the options' values should be prorated over the options' vesting periods.  At trial, Dr. Hakala explained that he based the 3-year moving average on the recommendation in SFAS No. 123 to prorate over the vesting period, and, in his report, he stated that the 3-year moving average was "in line with the vesting schedules underlying the options."  Ignoring the obvious chronological inconsistency in the latter justification, a 3-year moving average of options awarded in TYE 1996, TYE 1997, and TYE 1998 is still quite different from prorating the stock options' values over the vesting period.  As noted by petitioners, a 3-year moving average combines potentially less successful previous years with the TYE 1998 options' values.  Furthermore, the 3-year moving average does not treat the options as only partially vested in the first year.  In the absence of evidence to

substantiate the 3-year moving average, we must reject this portion of Dr. Hakala's valuation methodology.

### 5. Conclusion

After evaluating both experts' valuation methodologies in light of the record, we now compare Mr. Menard's TYE 1998 compensation to the Black-Scholes values of compensation paid in TYE 1998 to CEOs of Home Depot, Kohl's, Lowe's, Staples, and Target. With one exception,[49] we use Dr. Hakala's Black-Scholes stock option values computed before discounts.

The comparison group companies compensated their CEOs for services performed in TYE 1998 in the following amounts:

| Company | Compensation |
|---------|--------------|
| Home Depot | [1]$2,841,307 |
| Kohl's | 5,110,578 |
| Lowe's | 6,054,977 |
| Staples | 6,868,747 |
| Target | 10,479,528 |

[1]Home Depot did not compensate its CEO with stock options or restricted stock awards.

---

[49]Pursuant to rule 201 of the Federal Rules of Evidence, we take judicial notice of the TYE 1998 proxy statements filed with the Securities and Exchange Commission to the extent that they represent reported compensation for TYE 1998.

Target's proxy statement for its TYE 1998 reported that the options awarded to the CEO for that year included all options that would be granted to the CEO over a 3-year period. Accordingly, for the Black-Scholes value of Target's CEO's stock options in TYE 1998, we use only one-third of the value that Dr. Hakala computed.

Mr. Menard's compensation of $20,642,485 is nearly two times higher than Target's CEO's compensation, more than three times higher than Staples's and Lowe's CEOs' compensation, more than four times higher than Kohl's CEO's compensation, and more than seven times higher than Home Depot's CEO's compensation. After comparing Mr. Menard's compensation to the comparison group companies' CEOs' compensation, we conclude that (1) Mr. Menard's compensation substantially exceeded the compensation paid by comparable publicly traded companies to their CEOs, and (2) such evidence was sufficient to rebut the presumption of reasonableness created by Menards's rate of return on investment. Consequently, we examine the total record to decide what portion of Mr. Menard's compensation was reasonable.

In his report, Mr. Rowley asserted that Menards's performance in TYE 1998 demonstrated that Mr. Menard's compensation should be at or above the 90th percentile of the comparison group companies' compensation. We disagree. Nothing in the record suggests that, for a company of Menards's size and growth, compensating Mr. Menard at or above the 90th percentile is reasonable. Even so, certain measures of Menards's performance relied upon by Dr. Hakala and Mr. Rowley in their reports, and reproduced in the appendix to this Opinion, indicate that Mr. Menard's compensation should be much higher than the $1,380,876 that respondent allowed. We now must compare

Menards's performance to the comparison group companies' performances to determine how the marketplace valued services comparable to those provided to Menards by Mr. Menard during TYE 1998 and to decide what portion of Mr. Menard's compensation was reasonable within the marketplace. See Exacto Spring Corp. v. Commissioner, 196 F.3d at 838; sec. 1.162-7(b)(3), Income Tax Regs.

Although comparisons to Kohl's, Staples, and Target are helpful to an extent, we can more accurately gauge a reasonable amount of compensation for Mr. Menard by focusing on how Menards compared to its direct competitors in home improvement retailing, Home Depot and Lowe's, during TYE 1998. In his report, Dr. Hakala described Home Depot and Lowe's as "directly comparable" to Menards. Similarly, while contrasting Menards's performance during TYE 1998 with Home Depot's and Lowe's performances, petitioners characterized the two companies as Menards's "closest competitors". In TYE 1998, Home Depot, Lowe's, and Menards had gross revenue, revenue growth, and net income as follows:

| Company | Gross Revenue | Revenue Growth | Net Income |
|---------|---------------|----------------|------------|
| Home Depot | [1]$24.156 | 23.7% | $1.160 |
| Lowe's | 10.137 | 17.9 | 0.357 |
| Menards | 3.420 | 12.7 | [2]0.204 |

[1]All dollar amounts are in billions and have been rounded to the nearest million.

[2]A slight discrepancy existed between Mr. Rowley's and Dr. Hakala's numbers for the value of Menards's net income for TYE 1998. See Appendix. After comparing the expert reports to Menards's TYE 1998 financial statement, we accept the net income value as contained in Mr. Rowley's report.

Across all three measures, Menards performed in third place. In contrast, however, Menards had the highest return on equity and return on assets of its direct competitors:[50]

| Company | Return on Equity | Return on Assets |
|---------|------------------|------------------|
| Menards | 18.8% | 14.2% |
| Home Depot | 16.1 | 10.3 |
| Lowe's | 13.7 | 6.8 |

---

[50]Mr. Rowley calculated the companies' returns on "beginning shareholders' equity", "average shareholders' equity", and "average assets", but did not explain how he arrived at those numbers or why he used such variations on return on equity. Additionally, petitioners' expert on investor returns, John Gilbertson of Goldman, Sachs & Co., calculated returns on "beginning shareholders' equity", "average shareholders' equity", "beginning assets", and "average assets". Although Mr. Gilbertson explained how he arrived at those numbers, other than stating his rationale for emphasizing the return on average shareholders' equity over the return on beginning shareholders' equity, Mr. Gilbertson did not explain why he used these variations on return on equity and return on assets. In the absence of credible evidence to explain the calculations made by petitioners' experts, we shall rely on Dr. Hakala's values computed for the companies' return on equity and return on assets.

Ultimately, when compared to Home Depot and Lowe's, during TYE 1998, Menards was a small company that experienced less substantial revenue growth but generated a comparatively high return on equity. Considering the emphasis of the Court of Appeals for the Seventh Circuit on investors' returns in Exacto Spring Corp. v. Commissioner, supra at 838-839, in arriving at a reasonable amount of compensation, we attribute the most importance to Menards's comparatively high return on equity. We conclude, therefore, that as the home improvement retailer with the highest return on equity, Menards's CEO's compensation should be the highest value within the range of its direct competitors' CEOs' compensation.

Although Home Depot generated a higher return on equity than Lowe's did during TYE 1998, the amount of compensation that the CEO of Lowe's received was approximately 2.13 times higher than the amount of compensation that Home Depot's CEO received. Due to this lack of correlation between the rates of return on equity and the CEO compensation of Menards's direct competitors, we calculate a reasonable amount of compensation for Mr. Menard in the following manner:

$$\frac{16.1 \text{ (HD ROR)}}{\$2{,}841{,}307 \text{ (HD Comp)}} = \frac{18.8 \text{ (M ROR)}}{\$ \text{ (M Comp)}}$$

$$\text{M Comp} = \$3{,}317{,}799 \times 2.13 = \$7{,}066{,}912$$

Consequently, Menards is entitled to deduct $7,066,912 as compensation paid to Mr. Menard during TYE 1998.

C. Compensation for Services Actually Rendered

Although we have concluded that only a portion of Mr. Menard's compensation was reasonable in amount, as an alternative basis for our decision, we now consider whether Mr. Menard's compensation was payment for services actually rendered.  In cases involving a closely held corporation, compensation paid to a shareholder-employee is not the product of arm's-length bargaining and deserves special scrutiny.  Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 152 (8th Cir. 1974), affg. T.C. Memo. 1973-130; see also Exacto Spring Corp. v. Commissioner, supra at 838.  This is particularly so in this case because the board of directors consisted of Mr. Menard; Mr. Menard's brother, L. Menard; and Mr. Rasmussen, who depended on Mr. Menard for his own annual bonus.  Respondent contends that $19,261,609 of Mr. Menard's compensation was a disguised dividend.

In Exacto Spring Corp. v. Commissioner, 196 F.3d at 835, the Court of Appeals for the Seventh Circuit stated that the "primary purpose of section 162(a)(1)" is to prevent corporations from disguising dividends as salary.  The Court of Appeals for the Seventh Circuit explained that, in addition to satisfying the independent investor test, for compensation to qualify as a deductible business expense, the compensation must be "a bona fide expense".  Id. at 839.  The Court of Appeals for the Seventh

Circuit described as "material" to this inquiry any evidence showing that "the company did not in fact intend to pay * * * [the CEO] that amount as salary, that * * * [the CEO's] salary really did include a concealed dividend though it need not have." Id.

A taxpayer's intent with respect to the payment of compensation is a question of fact that we decide on the basis of the facts and circumstances of the case. Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973). Compensatory intent is subjective and difficult to prove. O.S.C. & Associates, Inc. v. Commissioner, 187 F.3d 1116, 1120 (9th Cir. 1999), affg. T.C. Memo. 1997-300; Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282.

If the Commissioner introduces evidence suggesting that the compensation was a disguised dividend, even if the payment was reasonable in amount, we inquire into whether the taxpayer had a compensatory purpose for the payment. O.S.C. & Associates, Inc. v. Commissioner, supra at 1121; Elliotts, Inc. v. Commissioner, supra at 1243-1244. The taxpayer's failure to pay dividends since its formation, alone, is not sufficient evidence of a disguised dividend. Elliotts, Inc. v. Commissioner, supra at 1244. However, the presence of the following six factors indicates that compensation was not intended for personal

services rendered: (1) Bonuses paid in exact proportion to officers' shareholdings; (2) payments made in lump sums rather than as the services were rendered; (3) a complete absence of formal dividend distributions by an expanding corporation; (4) a completely unstructured bonus system, lacking relation to services performed; (5) consistently negligible taxable corporate income; and (6) bonus payments made only to the officer-shareholders. See O.S.C. & Associates, Inc. v. Commissioner, supra at 1121; Nor-Cal Adjusters v. Commissioner, 503 F.2d at 362; Wagner Constr., Inc. v. Commissioner, T.C. Memo. 2001-160.

Although not all six factors from the list, supra, are present with respect to Mr. Menard's compensation,[51] other factors demonstrate that a portion of Mr. Menard's compensation was a disguised dividend. One relevant factor is that Menards has never paid a dividend, despite its tremendous growth over the years.[52] In addition, Menards paid the 5-percent bonus in one

---

[51]During TYE 1998, Mr. Menard was the only officer-shareholder who received a bonus. Chris Menard was a class B shareholder, but the record does not indicate whether he received a bonus during TYE 1998.

Additionally, during TYE 1998, although other executives received bonuses, Mr. Menard's bonus was firmly set at 5 percent of Menards's net income before taxes, and the record contains no evidence that Menards had consistently negligible taxable income.

[52]We recognize that, in Exacto Spring Corp. v. Commissioner, 196 F.3d 833, 837 (7th Cir. 1999), revg. Heitz v. Commissioner, T.C. Memo. 1998-220, in rejecting the multifactor test, the Court of Appeals for the Seventh Circuit observed that "the low level
(continued...)

lump sum rather than as Mr. Menard performed services. Perhaps more problematic, this lump-sum payment was "practically no different from a dividend": a profit-based, yearend bonus paid to the majority shareholder-officer.[53] See RAPCO, Inc. v. Commissioner, 85 F.3d 950, 954 n.2 (2d Cir. 1996), affg. T.C. Memo. 1995-128.

We also find significant Mr. Menard's agreement to reimburse Menards for any portion of the 5-percent bonus disallowed as a deduction. Such reimbursement clauses suggest that the taxpayer had preexisting knowledge that the compensation may not satisfy section 162(a)(1) and lead to the inference that the compensation was intended, in part, as a disguised dividend. See Charles Schneider & Co. v. Commissioner, 500 F.2d at 155; Saia Elec., Inc. v. Commissioner, T.C. Memo. 1974-290, affd. without published opinion 536 F.2d 388 (5th Cir. 1976).

Petitioners assert that Menards intended Mr. Menard's salary and the 5-percent bonus as compensation purely for his services.

---

[52](...continued)
of dividends paid by * * * [the taxpayer]" did not constitute evidence that the CEO's compensation was unreasonable for purposes of the first prong of sec. 162(a)(1). However, the Court of Appeals for the Seventh Circuit did not also reject this factor for purposes of determining whether the compensation was intended for personal services actually rendered. See Exacto Spring Corp. v. Commissioner, supra at 839; see also sec. 162(a)(1).

[53]We note that Mr. Menard was also one of the three directors who approved the 5-percent bonus.

According to petitioners, Menards's growth and performance were due to "the foresight, hard work, experience, skill, decision making ability, and energy of Mr. Menard."  With the 5-percent bonus, petitioners argue, Menards intended to establish a consistent method for determining Mr. Menard's variable compensation based on his efforts and the company's resulting success.

Even though Mr. Menard's hard work contributed greatly to Menards's success and, as a result of that success, the 5-percent bonus generally increased each year, we disagree with petitioners that this arrangement evinces an intent to compensate.  Although incentive compensation may encourage nonshareholder employees to put forth their best efforts, a majority shareholder invested in the company to the extent of Mr. Menard does not need the incentive.  See Charles Schneider & Co. v. Commissioner, supra at 153.  When large shareholders base their compensation on a percentage of the company's income, the arrangement may suggest an attempt to distribute profits without declaring a dividend. See Hampton Corp. v. Commissioner, T.C. Memo. 1964-150, affd. 16 AFTR 2d 65-5265, 65-2 USTC par. 9611 (9th Cir. 1965).

Contrary to petitioners' argument, the board's decision, made during the preceding fiscal year, to designate the 5-percent bonus as Mr. Menard's compensation for TYE 1998 does not insulate petitioners from the conclusion that Menards intended to

distribute profits.  With a corporation as successful and profitable as Menards, at the time of the board's resolution, barring some unforeseen catastrophe, the board could count on Mr. Menard's receiving a sizable bonus in TYE 1998 pursuant to the formula.  Moreover, the failure of the board, whose members were Menard employees and/or family members of Mr. Menard's, to make any effort to ascertain the market value of comparable corporate executives or to periodically evaluate the formula as a gauge of reasonable compensation, reinforces the impression that it was used to enable Mr. Menard to claim an extravagant bonus unrelated to the actual market value of his services as a corporate CEO.

On the basis of the evidence discussed, supra, we conclude that Mr. Menard's compensation was not intended entirely for personal services rendered and contained a distribution of profits.  Any amount in excess of $7,066,912 is unreasonable and a disguised dividend.  See supra pp. 53-58.  Accordingly, we hold that Menards is entitled to deduct $7,066,912 as an ordinary and necessary business expense pursuant to section 162(a)(1).

III.  Deductibility of the TMI Expenses

Section 162(a) provides a deduction for ordinary and necessary expenses that a taxpayer pays or incurs during the taxable year in carrying on a trade or business.  A taxpayer must maintain books of account or records sufficient to establish the

amount of the deductions.  See sec. 6001; sec. 1.6001-1(a),
Income Tax Regs.

Section 162(a) requires a taxpayer to prove that the
expenses deducted (1) were paid or incurred during the taxable
year, (2) were incurred to carry on the taxpayer's trade or
business, and (3) were ordinary and necessary expenditures of the
business.  See also Commissioner v. Lincoln Sav. & Loan
Association, 403 U.S. 345, 352 (1971).  An expense is ordinary if
it is customary or usual within a particular trade, business, or
industry or relates to a transaction "of common or frequent
occurrence in the type of business involved."  Deputy v. du Pont,
308 U.S. 488, 495 (1940).  An expense is necessary if it is
appropriate and helpful for the development of the business.  See
Commissioner v. Heininger, 320 U.S. 467, 471 (1943).  Even if an
expense is ordinary and necessary, however, the expense is
deductible only to the extent that it is reasonable in amount.
See United States v. Haskell Engg. & Supply Co., 380 F.2d 786,
788-789 (9th Cir. 1967); Ciaravella v. Commissioner, T.C. Memo.
1998-31.  In general, a taxpayer who pays another taxpayer's
business expenses may not treat those payments as ordinary and
necessary expenses incurred in the payor's business.  See
Columbian Rope Co. v. Commissioner, 42 T.C. 800, 815 (1964); see
also Interstate Transit Lines v. Commissioner, 319 U.S. 590
(1943); Deputy v. du Pont, supra at 495; S. Am. Gold & Platinum

Co. v. Commissioner, 8 T.C. 1297 (1947), affd. 168 F.2d 71 (2d Cir. 1948).

A.   Responsibility for the TMI Expenses--The Alleged Oral Sponsorship Agreement

1.   The Parties' Positions

Petitioners contend that, since TMI's formation in 1992, Menards and TMI have had an oral agreement that Menards would sponsor TMI's Indy cars.  In lieu of a formal sponsorship fee, petitioners explain, Menards agreed to pay the TMI expenses in exchange for the "full benefits of a founding sponsor."[54]  In contrast, respondent contends that there was no oral sponsorship agreement.

2.   Terms of the Alleged Oral Sponsorship Agreement

At trial, Mr. Menard testified that when TMI was formed in 1992, Menards made an oral agreement with TMI to pay some of TMI's racing expenses in exchange for "all the benefits of the sponsorship".  As Mr. Menard understood the term "benefits", TMI

_____

[54]Petitioners describe the "full benefits" of a "founding sponsor" to include the following:

significant, prominent name identification on the race cars, team uniforms, transporters, race car transporters, pit walls and all publicity and promotional materials developed by the team and the IRL[;] hospitality at the races for * * * [Menards's] suppliers, customers, and guests[;] naming rights for the entries[;] tickets[;] access to viewing suites[;] parking privileges[;] name and likeness grants[;] as well as personal appearances of the TMI drivers.

was required to do "whatever was necessary" for Menards's business, such as sending drivers to appear at grand openings of Menards stores. Menards did not specify a particular amount of TMI's expenses that Menards would pay, Mr. Menard testified, but, instead, agreed to cover a certain "group of expenses" in the "amount necessary to get the job done." Mr. Menard explained that he had "a pretty good idea what it was going to cost."

### 3. Analysis

As respondent has pointed out, the alleged oral sponsorship agreement between Menards and TMI is essentially an oral agreement that Mr. Menard made with himself as president of both companies. Considering the vagueness of Mr. Menard's description of the alleged agreement's terms, his testimony lacks credibility. Two Menards executives, L. Menard and Mr. Norquist, and Menards's outside accountant, Mr. Stienessen, testified to having knowledge of a sponsorship agreement between Menards and TMI. We conclude, however, that the probative value of their brief and somewhat self-interested testimony[55] on the matter is outweighed by the rest of the evidence.[56]

---

[55]The annual compensation, including annual bonuses, of Mr. L. Menard and Mr. Norquist was fixed by Mr. Menard, and Mr. Stienessen, the preparer of Menards's returns, depended upon Mr. Menard for ongoing business.

[56]We need not accept at face value a witness's testimony that is self-interested or otherwise questionable. See Archer v. Commissioner, 227 F.2d 270, 273 (5th Cir. 1955), affg. a

(continued...)

Several factors contradict petitioners' assertion that Menards and TMI made an oral sponsorship agreement pursuant to which Menards would pay certain TMI expenses in exchange for sponsorship benefits. First, TMI did not report on its tax return or record in its books and records any sponsorship income from Menards, with the possible exception of $45,000 for TYE 1998. Second, TMI reported income from its other sponsors on both its tax return and sponsorship income reports. Third, instead of creating separate accounts in its books and records identifying the TMI expenses as sponsorship fees or advertising expenses, Menards commingled the payments made on TMI's behalf with Menards's other business expenses. Fourth, the only explanation provided for Menards's accounting method was that Menards "had historically done that * * * and * * * [Menards] continued that practice of what * * * [it] had done in the past." Fifth, when Menards deducted the TMI expenses on its tax returns, Menards did not identify the deductions as sponsorship fees or advertising expenses.

### 4. Conclusion

The record contains no credible evidence of an oral sponsorship agreement between Menards and TMI. Moreover, the

---

[56](...continued)
Memorandum Opinion of this Court dated Feb. 18, 1954; Weiss v. Commissioner, 221 F.2d 152, 156 (8th Cir. 1955), affg. T.C. Memo. 1954-51; Schroeder v. Commissioner, T.C. Memo. 1986-467.

factors discussed above strongly weigh against the alleged agreement's existence. On the basis of Menards's and TMI's behavior with respect to the accounting and reporting of the payments and expenses, we conclude that Menards used TMI as a means to continue Menards's participation in Indy racing, while shielded from liability, but did not do so pursuant to an oral sponsorship agreement.[57] The expenses that Menards paid were TMI's expenses for which TMI was obligated.

B. Deductibility of One Corporation's Payment of Another Corporation's Ordinary and Necessary Business Expenses[58]

Although a corporation generally may not deduct payments of another corporation's expenses,[59] see supra p. 65, and Menards did not pay TMI's expenses pursuant to an oral sponsorship agreement, Menards still may be entitled to a deduction. An exception exists for cases in which the taxpayer paid the other corporation's ordinary and necessary business expenses in order to "protect or promote" the taxpayer's own business. See, e.g.,

_____

[57]We note that respondent does not allege, nor do we find, that TMI should not be respected as a separate taxable entity. On the contrary, TMI was formed for a business purpose and has carried on that business since its formation. See Moline Props, Inc. v. Commissioner, 319 U.S. 436, 439 (1943).

[58]Respondent does not question whether the TMI expenses were ordinary and necessary business expenses incurred with respect to TMI's business.

[59]Even if the corporations were under common ownership or control, the payor corporation may deduct, in limited circumstances, only expenditures that further its own business. See Oxford Dev. Corp. v. Commissioner, T.C. Memo. 1964-182.

Scruggs-Vandervoort-Barney, Inc. v. Commissioner, 7 T.C. 779 (1946); Moloney Elec. Co. v. Commissioner, 42 B.T.A. 78 (1940), affd. in part and revd. in part on another issue 120 F.2d 617 (8th Cir. 1941); First Natl. Bank v. Commissioner, 35 B.T.A. 876 (1937); Metro Land Co. v. Commissioner, T.C. Memo. 1981-335; Hudlow v. Commissioner, T.C. Memo. 1971-218.  In Lohrke v. Commissioner, 48 T.C. 679, 688 (1967), we articulated a two-part test for determining whether a taxpayer's payments are eligible for this exception:  (1) The taxpayer's primary motive for paying the expenses was to protect or promote the taxpayer's business, and (2) the expenditures constituted ordinary and necessary expenses in the furtherance or promotion of the taxpayer's business.  See also Square D. Co. & Subs. v. Commissioner, 121 T.C. 168, 198-201 (2003).

### 1.  Menards's Primary Motive for the TMI Payments

Regarding the first prong of the Lohrke test, the taxpayer must establish a direct nexus between the payment's purpose and the taxpayer's business.  See Bone v. Commissioner, T.C. Memo. 2001-43; JRJ Express, Inc. v. Commissioner, T.C. Memo. 1998-200 (citing Lettie Pate Whitehead Found., Inc. v. United States, 606 F.2d 534, 538 (5th Cir. 1979)).  Accordingly, we consider whether the taxpayer made the payments primarily to promote its

business.[60]  <u>JRJ Express, Inc.</u> provides an example of self-promotion as the taxpayer's primary purpose.  In <u>JRJ Express, Inc.</u>, the taxpayer was a courier business that delivered letters and small packages from the United States to Guatemala.  The taxpayer's sole shareholder's brothers owned and controlled several Guatemalan companies that made similar deliveries from Guatemala to the United States and used the same company logo as the taxpayer.  Pursuant to an oral agreement, the taxpayer paid the Guatemalan companies' inbound expenses, in exchange for which the Guatemalan companies printed and stuffed promotional materials advertising the taxpayer's business in all Guatemalan mail bound for U.S. destinations.  <u>Id.</u>

We concluded in <u>JRJ Express, Inc.</u> that the taxpayer's payments were primarily intended to protect or promote the taxpayer's delivery service.  Because of the nature of the taxpayer's business, the promotion and marketing process was the business's "centerpiece".[61]  Through the insertion of

_____

[60]Another consideration under the first prong of the <u>Lohrke</u> test, not applicable to the present case, is whether the taxpayer faced a "'clear proximate danger'" and made payments "'to protect an existing business from harm'".  <u>Bone v. Commissioner</u>, T.C. Memo. 2001-43; <u>JRJ Express, Inc. v. Commissioner</u>, T.C. Memo. 1998-200 (quoting <u>Young & Rubicam, Inc. v. United States</u>, 187 Ct. Cl. 635, 410 F.2d 1233, 1243 (1969)).

[61]In <u>JRJ Express, Inc. v. Commissioner</u>, <u>supra</u>, we also noted that, due to the transient nature of many Guatemalan workers in the United States, the taxpayer's business faced a "clear proximate danger" if the taxpayer could not maintain a "fluid
(continued...)

advertisements in the Guatemalan mail, the taxpayer "derived a substantial benefit not otherwise available", which ultimately generated much of the taxpayer's revenues that year. The taxpayer's payment of the inbound expenses had a direct nexus with the taxpayer's business. Id.

Petitioners assert that Menards's primary motive for paying the TMI expenses was to promote Menards's business and that a direct nexus existed between the purpose of the TMI payments and Menards's business. Although there was no oral sponsorship agreement between Menards and TMI, this case is similar to JRJ Express, Inc. in that the taxpayer received a benefit in return for paying the other corporation's expenses. In TYE 1998, Menards paid the TMI expenses and, for no additional fee, received Indy race car sponsorship benefits, which, like the benefits in JRJ Express, Inc., were advertising and promotional benefits.

Indy racing may not be the only form of advertising available to Menards for targeting potential customers, but participation in motor sports is an innovative and exciting method for generating local, national, and international publicity for Menards's business. Menards's competitors' decisions to become involved in motor sports also highlights its

[61](...continued)
mailing list" through advertising stuffed in the inbound mail.

appeal as a form of effective advertising.  Even though Mr. Menard had a personal interest in racing, any personal enjoyment that he gained from Menards's involvement in motor sports was incidental to the benefits Menards's business received through its relationship with TMI.

Long before TMI's incorporation, Menards used motor sports as a way to publicize its business and continued that practice after TMI's creation.  Mr. Menard testified that Menards's intent behind the TMI payments was to have the same racing benefits as it did prior to TMI's incorporation, acquire national and international publicity through TMI's notoriety, and promote Menards's products.  When Mr. Menard formed TMI and named it "Team Menard", he indelibly associated the Menards stores with the Indy racing team.

After carefully considering the evidence, we conclude that to the extent we hold, infra, that the TMI expenses were reasonable in amount, Menards's primary motive for paying the TMI expenses was to promote Menards's business.  Menards received broad advertising exposure from its involvement with TMI.  The races provided opportunities for Mr. Menard and other Menards executives to network with vendors and create and maintain goodwill with customers.  Moreover, had Menards not been concerned about potential liability in the event of a racing

accident, Menards likely would not have incorporated TMI and would have continued to sponsor race cars directly.

2. Whether the TMI Expenses Were Ordinary and Necessary in the Furtherance of Menards's Business

To meet the second part of the Lohrke test, the taxpayer must demonstrate that the expenses were ordinary and necessary in the furtherance or promotion of the taxpayer's business.  With respect to race car sponsorship expenditures, we have held that, to the extent the expenditures are reasonable in amount, the taxpayer may deduct them as ordinary and necessary business expenses attributable to advertising.  See, e.g., Ciaravella v. Commissioner, T.C. Memo. 1998-31; Gill v. Commissioner, T.C. Memo. 1994-92, affd. without published opinion 76 F.3d 378 (6th Cir. 1996); Boomershine v. Commissioner, T.C. Memo. 1987-384; Brallier v. Commissioner, T.C. Memo. 1986-42; Hestnes v. Commissioner, T.C. Memo. 1983-727, affd. without published opinion 762 F.2d 1015 (7th Cir. 1985); Lang Chevrolet Co. v. Commissioner, T.C. Memo. 1967-212.  First, however, a taxpayer must show that the purpose for sponsoring the racing activity was "to gain a reasonable amount of publicity" for the taxpayer's business.  Lang Chevrolet Co. v. Commissioner, supra.  One objective indication of the taxpayer's intent behind the racing expenditures is "the reasonableness of the relationship between the amount expended for the activity compared to the amount of benefit reasonably calculated to be derived."  Id.  We now

consider whether the amount of Menards's expenditures was reasonably related to the amount of the benefit that Menards derived.

Petitioners contend that the TMI expenses were "in the range of what a sponsor/independent-third-party would pay to be a sponsor of successful cars like those owned by TMI in exchange for the benefits received by Menards."  In support of their assertion, at trial, petitioners introduced expert testimony regarding the value of a race car sponsorship.  Respondent offered a sponsorship valuation expert, but the Court did not recognize him as an expert for purposes of this case.

### a.  Petitioners' Experts

Petitioners' first expert was John P. Caponigro, president of Sports Management Network, Inc. (SMN).[62]  SMN represents champion race car drivers, among other sports and entertainment industry personalities, and specializes "in the business side" of motor sports.  SMN's motor sports marketing and consultation division, called SMN Motorsports, analyzes, structures, and negotiates sponsorship programs for the IRL.  When valuing sponsorships, Mr. Caponigro considers factors such as the league schedule, television coverage and ratings, onsite attendance,

---

[62]Mr. Caponigro has been the president of SMN since the company's inception in 1989.

hospitality, merchandising, business-to-business opportunities, and special events.

For purposes of valuing television exposure, in his expert report, Mr. Caponigro relied on Indy racing yearend sponsor reports published by Joyce Julius and Associates, Inc. (Joyce Julius). According to Mr. Caponigro, Joyce Julius is the "most prominent" sponsorship reporting service in racing. Joyce Julius measures and assigns a value to sponsors' television exposure during races. The measurement process involves watching videotapes of the races and recording the frequency and duration of verbal or visual references to sponsors' names or logos. In order to assign a value, Joyce Julius then multiplies the amount of exposure time by the cost of purchasing an identical amount of television commercial time.[63]

The Joyce Julius report for the 1997 IRL season ranked Menards fifth out of 522 associate, series, and event (AS&E) sponsors, with an estimated exposure value of $8,457,925. For the 1998 IRL season, Menards's estimated exposure value was $3,518,165, for a sixth-place ranking among a total of 524 AS&E sponsors.

---

[63]Critics of Joyce Julius reports question whether sponsor name and logo exposure during races necessarily equates with television commercial exposure and whether the logos often pass too fleetingly on screen to make an impression on viewers.

In addition to television exposure, in his expert report, Mr. Caponigro considered the following factors that he claimed enhance sponsorship values: (1) The "prestige of participating in the Indy 500";[64] (2) good team performance on a consistent basis; (3) one or more drivers with "star power"; and (4) the extent to which a sponsor requires ancillary rights, such as use of a driver's name, image, and likeness.

Finally, the business opportunities afforded by sponsorships may affect the sponsorship's value. At the races, sponsors develop business relationships with other participants and learn about their products and services in a "more personal environment". If a sponsor is in business competition with one or more other participants, the sponsor may spend more on a sponsorship in order to match the size and scope of its competitors' sponsorships.

In his report, Mr. Caponigro also explained the different levels of sponsorship categories. Mr. Caponigro described primary sponsors as "usually the most prominent visually or most important to the program." The second class of sponsors, "associate/secondary" sponsors, are "smaller in scope yet still

---

[64]He described the Indy 500 as equal in prominence to the World Series or the Super Bowl and called it a "Memorial Day tradition".

prominent."  Mr. Caponigro estimated that IRL primary and associate sponsorship values range from $2 million to $20 million and $100,000 to $5 million, respectively.[65]

After reviewing the extent of Menards's involvement with TMI, Mr. Caponigro classified Menards as a "primary/foundation[66] sponsor" for both 1997 and 1998.  Mr. Caponigro reached this conclusion for 1997 even though Glidden had "some graphic designations and positioning as would a primary sponsor on some teams" and the Joyce Julius reports categorized Glidden as the primary or "team" sponsor.  According to Mr. Caponigro, regardless of other sponsor's logo positioning on the TMI race

_____

[65]In his expert report, Mr. Caponigro combined CART with the IRL to construct these sponsorship value ranges.  As a result, we suspect that the range of values may be exaggerated.  CART races take place all over the world, including races in Europe and Australia.  Additionally, the CART schedule contains more races than the IRL schedule.  According to Mr. Caponigro, the annual IRL team budgets range from $2 million to $25 million or higher, whereas the CART budgets range from $5 million to $50 million or higher.  Petitioners' second expert, Cary J.C. Agajanian, also indicated that CART teams typically spend more than IRL teams. Clearly, CART teams compete on a grander scale than the IRL teams, require more operating funds, and would need more money from sponsors to help offset the team's operating costs.  We disagree with Mr. Caponigro's assertion that CART and the IRL are similar enough to warrant "frequent comparisons" between the teams for purposes of valuing an IRL sponsorship.  Accordingly, we disregard as irrelevant the references in his expert report to CART.

[66]According to Mr. Caponigro, a foundation sponsor is the team's core sponsor, which maintains a continuous presence.

cars, "it was clear in the racing circles that * * * [the primary sponsor] was Team Menard."[67]

Ultimately, Mr. Caponigro concluded that the range of reasonable sponsorship fee values for the sponsorship benefits Menards received in each of the 1997 and 1998 IRL seasons was between $5 million and $7 million. Mr. Caponigro decided that this range of values was reasonable based on the sponsorship benefits Menards received, the general price structure of comparable arrangements in the industry, the exposure value Menards derived, and the business advantages available to Menards through the racing program.

Petitioners' second expert on sponsorship valuation was Cary J.C. Agajanian of Motorsports Management International. Over the last 70 years or more, Mr. Agajanian's family has been involved in the ownership of race cars, including Indy cars. Mr. Agajanian has experience in race promotion, race officiation, sponsorship contracts, and contracts between drivers and primary and secondary sponsors. He has "negotiated hundreds of sponsorship contracts with major corporations for name title sponsorships, trackside signage, television programming, and racing vehicles." During 1997 and 1998, Mr. Agajanian was Tony

---

[67]We assume that, when he made this remark at trial, Mr. Caponigro meant that Menards, rather than TMI, was the primary sponsor of TMI.

Stewart's manager and, in 1998, represented Mr. Stewart in contract litigation against Mr. Menard.

Like Mr. Caponigro, Mr. Agajanian examined the 1997 and 1998 Joyce Julius yearend sponsor reports on television exposure value but cautioned that the Joyce Julius reports are intended for comparisons between brands and do not set firm advertising values. Moreover, Mr. Agajanian explained, the Joyce Julius reports do not account for other forms of exposure, including newspapers, magazines, radio, internet, and racing fans' brand loyalty. According to Mr. Agajanian, the "normally accepted premise" regarding racing media exposure is that television constitutes 40 percent to 50 percent of total sponsor media exposure.

Applying the 50-percent premise to Menards's Joyce Julius television exposure values for 1997 and 1998, Mr. Agajanian estimated that Menards's total media exposure value from its involvement with TMI was $16,914,000 for 1997 and $7,036,000 for 1998. Mr. Agajanian attributed the difference between Menards's exposure values for 1997 and 1998 to Menards's having more wins and leading more laps in 1997.

In addition to television exposure, Mr. Agajanian's report discussed another factor affecting sponsorship values, the market-driven nature of sponsorship pricing. He explained that winning or leading cars gain "millions of dollars of exposure"

from the live audience and worldwide television and radio broadcasts of the races and, as a result, charge higher sponsorship fees. Mr. Agajanian estimated that Indy sponsorship fees for the competitive teams in the 1997 and 1998 IRL seasons ranged from $3 million to $6 million per car. For the Indy teams, in general, during the 1997 and 1998 IRL seasons, Mr. Agajanian explained, the total fees ranged from $2 million to $10 million per car.

Mr. Agajanian concluded that the amount Menards spent on the TMI expenses was reasonable, especially when considering TMI's "dominant performance" during 1997 and 1998. Assuming that Menards spent between $5 million and $7 million each year for two cars, Mr. Agajanian compared that price of $2.5 million to $3.5 million per car to the market price and determined that Menards "more than received fair value" in exchange for the TMI payments.

b. Value of Sponsorship Benefits Menards Received

Relying on Mr. Caponigro's and Mr. Agajanian's expert reports, petitioners argue that, in light of the media exposure Menards received through its involvement with TMI and other advertising benefits, the TMI expenses were reasonable in amount. However, respondent criticizes the expert reports, calling Mr. Agajanian's report "vague and unsupported" and questioning Mr. Agajanian's impartiality due to his business relationship with Mr. Menard. Respondent argues that the experts should have

compared Menards's share of sponsorship benefits to the other sponsors' shares, for which records of fees paid were available, and should have clarified whether Menards's logo placement affected the value of benefits received. Respondent also points out that the Joyce Julius reports, relied on by both experts, classified Glidden as the primary sponsor.

After reviewing both experts' reports, we find it necessary to conduct our own examination of the evidence in the record to properly determine the value of the sponsorship benefits Menards received. See Malachinski v. Commissioner, 268 F.3d 497, 505 (7th Cir. 2001), affg. T.C. Memo. 1999-182. Mr. Caponigro's and Mr. Agajanian's reports are helpful to the extent that the reports provide a range of reasonable sponsorship values, explain the valuation of television exposure, and list the other variables that contribute to a sponsorship's value. However, both reports lack explanations for important assumptions related to the experts' conclusions. For example, neither report discusses the approximate values of the various sponsorship benefits Menards received or compares the benefits to those received by other TMI sponsors. "The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based." Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998).

For both 1997 and 1998, TMI had more than one major sponsor. Mr. Menard testified that Quaker State was the primary sponsor of the Robbie Buhl car in 1997, which assertion is consistent with the placement of the Quaker State logo on the race car.  In 1998, the same placement and prominence was true of the Johns Manville logo on Mr. Buhl's race car and uniform.  Additionally, during 1997 and 1998, Glidden's logo was featured most prominently on the Tony Stewart car and, in 1997, on Mr. Stewart's uniform.

Despite the significant exposure Glidden, Quaker State, and Johns Manville received through logo placement and naming, we cannot say that, in comparison, Menards's involvement was smaller in scope or more akin to an associate sponsorship.  We find persuasive evidence of Menards's involvement as similar to a primary sponsor in the inclusion of "Menards" in both race car names, strategic placement of Menards's logo on the race car and drivers' uniforms, and the prominence of Menards's name on Indy promotional materials.  Moreover, Menards's use of its association with TMI for purposes of Menards's business is more consistent with the privileges of a primary sponsor:  The TMI drivers attended store grand openings at which they signed autographs; TMI provided an Indy car for display at the grand openings; Menards's Race to Savings sale ads featured TMI's Indy cars and logo, as did Menards's employees' uniforms worn for the

sale; and Menards's guests at the races had access to the garage, the pits, the track, and the drivers for photos and autographs.

In order to determine what portion of the TMI expenses was reasonable in amount, we turn to the sponsorship fees TMI's other primary sponsors paid. Cf. Gill v. Commissioner, T.C. Memo. 1994-92 (arm's-length standard of reasonableness based on the amount the taxpayer's corporation paid to sponsor an independent third-party's racing activities). For the 1997 IRL season, Glidden and Quaker State paid $1.8 million and approximately $1.5 million, respectively, in sponsorship fees. In addition to paying a sponsorship fee, Glidden provided TMI with financial assistance estimated to be worth at least $550,000, which would increase Glidden's total sponsorship payment to $2.35 million. In exchange for their total sponsorship fees, Glidden and Quaker State received primary sponsorship designations for the Tony Stewart car and Robbie Buhl car, respectively, and less prominent logo placement on the car for which they were not designated primary sponsors.[68]

For the 1998 IRL season, Glidden paid TMI a sponsorship fee and provided additional financial assistance for a total of at least $2.55 million. As in 1997, Glidden received primary

---

[68]Menards likely charged higher sponsorship fees for Mr. Stewart's car because, in 1996, Mr. Stewart was named the Indy 500 Rookie of the Year and the fastest rookie in the history of the Indy 500.

sponsorship designation with respect to the Tony Stewart car and less prominent logo placement on the Robbie Buhl car. The $200,000 increase from the 1997 sponsorship fee may have been partly attributable to Tony Stewart's winning the IRL Championship in 1997. Because the record does not indicate how much Johns Manville paid to sponsor the Robbie Buhl car in 1998, but TMI as a team shared the prestige of the 1997 IRL Championship win, we assume that the Robbie Buhl car sponsorship fee increased at least half as much in proportion to the increase in the Tony Stewart car sponsorship fee. Accordingly, we attribute a sponsorship fee value of $1,583,333 to Johns Manville's primary sponsorship of the Robbie Buhl car.[69]

On the basis of the record, we conclude that, to the extent Menards's payment of the TMI expenses equaled the combined 1997 primary sponsorship fees paid by Glidden and Quaker State and the combined 1998 primary sponsorship fees paid by Glidden and Johns Manville, the TMI payments were reasonable in amount and deductible pursuant to section 162(a). As a result, for TYE 1998, Menards may deduct as advertising expenses a prorated

---

[69]We calculated the value as follows: $200,000/1,800,000 = .111111; .111111/2 = .055555; .055555 x 1,500,000 = $83,333; 1,500,000 + 83,333 = $1,583,333]

portion of the 1997 and 1998 primary sponsorship fees equal to $3,873,611.[70]

## IV. The TMI Expenses as a Constructive Dividend

The amount of TMI expenses that Menards paid during 1998 as advertising expenses was unreasonable to the extent of $1,619,918.[71]  Respondent alleges that this difference (the excess TMI expenses) was a constructive dividend to Mr. Menard.

Section 61(a)(7) includes dividends in a taxpayer's gross income.  Section 316(a) defines a dividend as any distribution of property that a corporation makes to its shareholders out of its earnings and profits.  A constructive dividend may arise "'Where a corporation confers an economic benefit on a shareholder without the expectation of repayment, * * * even though neither the corporation nor the shareholder intended a dividend.'"  Hood v. Commissioner, 115 T.C. 172, 179 (2000) (quoting Magnon v. Commissioner, 73 T.C. 980, 993-994 (1980)).

---

[70]We calculated the amount as follows:  Step 1:  $3,850,000 (1997's fees added together: $2.35M + $1.5M)/12 (months) x 11 (months) (Feb.-Dec. 1997) = $3,529,167; Step 2:  $4,133,333 (1998's fees added together:  $2.55M + 1,583,333)/12 (months) x 1 (month) (Jan. 1998) = $344,444; Step 3:  $3,529,167 + 344,444 = $3,873,611.

[71]We calculated the amount as follows:  $5,703,251 (alleged constructive dividend amount) - $4,083,333 (1998 fees added together:  $2.55M + 1,583,333) = $1,619,918.

Transfers of property from one corporation to a related corporation may constitute a constructive dividend to the corporations' common shareholder whether or not the shareholder directly receives any property.  See Sammons v. Commissioner, 472 F.2d 449, 451 (5th Cir. 1972), affg. in part, revg. in part on another ground and remanding T.C. Memo. 1971-145; Gulf Oil Corp. v. Commissioner, 87 T.C. 548, 565 (1986); Rapid Elec. Co. v. Commissioner, 61 T.C. 232, 239 (1973); Shedd v. Commissioner, T.C. Memo. 2000-292.  The underlying theory is that the property passes from the transferor corporation to the common shareholder and then from the common shareholder to the transferee corporation as a capital contribution.  See Sammons v. Commissioner, supra at 453; Davis v. Commissioner, T.C. Memo. 1995-283.  Ultimately, for constructive dividend treatment, the transfer must satisfy two tests:  (1) The objective distribution test, and (2) the subjective primary purpose test.

A.  The Objective Distribution Test

The objective distribution test examines whether the transfer caused property to leave the transferor corporation's control, permitting the common shareholder to exercise direct or indirect control over the property through some other instrumentality, such as the transferee corporation.  Sammons v. Commissioner, supra at 451; Gulf Oil Corp. v. Commissioner, supra

at 565; <u>Shedd v. Commissioner</u>, <u>supra</u>; <u>Davis v. Commissioner</u>, <u>supra</u>. According to respondent, because Mr. Menard was the president and sole shareholder of TMI, he obtained indirect control over the cash that Menards paid to TMI's vendors. We agree with respondent. See <u>Shedd v. Commissioner</u>, <u>supra</u>.

B.  <u>The Subjective Primary Purpose Test</u>

The subjective primary purpose test helps distinguish related corporations' regular business transactions from transfers intended primarily to benefit the common shareholder. <u>Sammons v. Commissioner</u>, <u>supra</u> at 451; <u>Shedd v. Commissioner</u>, <u>supra</u>. Although some business justification may exist for the property transfer, if the primary or dominant motivation was to benefit the common shareholder, and the shareholder received a direct and tangible benefit, the distribution is a constructive dividend. See <u>Rapid Elec. Co. v. Commissioner</u>, <u>supra</u> at 239; <u>Chan v. Commissioner</u>, T.C. Memo. 1997-154; <u>Davis v. Commissioner</u>, <u>supra</u>; see also <u>Broadview Lumber Co. v. United States</u>, 561 F.2d 698, 704 (7th Cir. 1977) (citing <u>Wilkinson v. Commissioner</u>, 29 T.C. 421 (1957)). Mere incidental or derivative benefits to the common shareholder will not result in constructive dividend treatment. <u>Shedd v. Commissioner</u>, <u>supra</u>. "However, where a corporation's distribution serves no legitimate corporate purpose, it must be treated as a constructive dividend to the

benefitted shareholder." Id.; see also United States v. Mew, 923 F.2d 67, 68 (7th Cir. 1991).

Respondent contends that Menards's primary reason for paying the excess TMI expenses was to benefit Mr. Menard through his common ownership of Menards and TMI. Without Menards's payment of the excess TMI expenses, respondent asserts, Mr. Menard would have had to contribute additional capital to TMI in order to pay TMI's vendors. Furthermore, respondent argues, the record contains no evidence that Menards's payment of the excess TMI expenses constituted some other legitimate business transaction, such as a loan.

In contrast, petitioners contend that the primary purpose behind Menards's payment of the excess TMI expenses was to benefit Menards. Pointing to TMI's reported 1998 taxable income of $5,268,279, petitioners dispute respondent's contention that without Menards's payments, Mr. Menard would have had to contribute additional capital to TMI. Petitioners also emphasize that Mr. Menard was not personally obligated to pay the excess TMI expenses and did not otherwise directly benefit from the payments.

In applying the subjective test, we first examine the business purpose for Menards's payment of the excess TMI expenses. We held, supra, that the excess TMI expenses were not

Menards's ordinary and necessary business expenses.  The record contains no other credible explanation for Menards's payments. We conclude, therefore, that Menards's payment of the excess TMI expenses was intended to benefit Mr. Menard as the sole shareholder of TMI.

In addition, the record indicates that Mr. Menard directly and tangibly benefited from Menards's payment of the excess TMI expenses.  Although Mr. Menard was not personally liable for the expenses, Menards's payments provided TMI additional capital,[72] which obviated the need for Mr. Menard to contribute from his personal resources and enhanced the value of Mr. Menard's 100-percent ownership interest.  See Lohrke v. Commissioner, 48 T.C. at 689 ("the payment of a corporation's expenses is one way to provide capital"); Davis v. Commissioner, supra.

C.  Conclusion

Menards's payment of the excess TMI expenses resulted in a constructive dividend from Menards to Mr. Menard.  As TMI's president and sole shareholder, Mr. Menard exercised indirect control over the payments.  Moreover, the payments lacked a legitimate business justification and directly benefited Mr.

_____

[72]At trial neither party introduced specific evidence on the adequacy of TMI's capitalization.  Accordingly, we decline to decide whether TMI required additional capital.

Menard.  Consequently, Mr. Menard is liable for tax on the full amount of the excess TMI expenses, $1,619,918.

V.  <u>Constructive Receipt of Interest Income</u>

Respondent alleges that in 1998 Mr. Menard constructively received interest income in the amount of $639,302 from loans Mr. Menard made to Menards.  On its tax return for TYE 1998, Menards deducted the accrued interest but did not issue a check to Mr. Menard until January 29, 1999.  After receiving the check, Mr. Menard reported the interest income on his 1999 tax return. Respondent contends that Mr. Menard should have reported the interest income in 1998 for the following reasons:  (1) Menards had credited the interest income to Mr. Menard's account, making it available for Mr. Menard's use during 1998, and (2) as president, Mr. Menard had the authority to demand payment of the accrued interest at any time.

Section 61(a)(4) includes interest in a taxpayer's gross income.  Section 1.451-2(a), Income Tax Regs., provides:

> (a) General rule.  Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.  * * *

Whether a taxpayer constructively received income is a question of fact.  <u>Willits v. Commissioner</u>, 50 T.C. 602, 613 (1968).

According to petitioners' interpretation of the facts, although Mr. Menard was the president and controlling shareholder of Menards and had the power to order Menards to distribute funds to him, Mr. Menard did not have an unqualified, vested right to receive the interest in 1998.  Petitioners also contend that even though Menards was financially able to pay Mr. Menard in 1998, Menards did not set the funds aside for that purpose.

In support of their position, petitioners rely on <u>Jerome Castree Interiors, Inc. v. Commissioner</u>, 64 T.C. 564 (1975), affd. without published opinion 539 F.2d 714 (7th Cir. 1976).  In <u>Jerome Castree Interiors, Inc.</u>, which involved section 267 and transactions between related taxpayers, the taxpayer-corporation's president and his brother, both cash basis taxpayers, reported bonuses that had accrued in the preceding year on their tax returns for the year in which the bonuses were paid.  During the accrual year, the total amount of bonuses to be awarded had not been allocated among the individual officers.  However, on its tax return for that year, the taxpayer-corporation, an accrual basis taxpayer, deducted the total bonus amount.  We held in <u>Jerome Castree Interiors, Inc.</u> that the taxpayer-corporation's president and his brother did not

constructively receive their bonuses during the accrual year for the following reasons:  (1) During the accrual year, the individual bonus amounts due each officer were not entered in the books and records, credited to the officers' accounts, or otherwise set apart for them, and (2) payment of the bonuses was conditioned on the taxpayer-corporation's financial status.  See id. at 569-570.

We disagree with petitioners' assertion that the circumstances surrounding the accrued interest in this case are similar to the facts of Jerome Castree Interiors, Inc.  Unlike the taxpayer-corporation in Jerome Castree Interiors, Inc., Menards set aside Mr. Menard's accrued interest during the accrual year; Menards's TYE 1998 financial statement reported the exact amount of interest that had accrued during the year on the loans payable to Mr. Menard.  Another difference between this case and Jerome Castree Interiors, Inc. is that the record here contains no evidence of any restrictions placed by Menards on the payment of the accrued interest.  Moreover, Menards's TYE 1998 financial statement indicated that Mr. Menard's loans to the corporation were payable on demand.

The present case is more similar to <u>Heitz v. Commissioner</u>, T.C. Memo. 1998-220.[73]  In <u>Heitz</u>, the taxpayers made loans to a corporation of which the taxpayer husband was the controlling shareholder, president, and CEO.  An accrual basis taxpayer, the corporation fully deducted interest on the taxpayers' loans during the accrual year.  However, because a portion of the interest was not paid until the following year, the taxpayers, who used the cash basis method, reported that portion in the year of receipt.  We concluded in <u>Heitz</u> that the taxpayers constructively received that portion as interest income during the accrual year.  After acknowledging the taxpayer husband's authority, as the corporation's president and CEO, to order payment of the accrued interest, we based our decision on the taxpayers' failure to show that they lacked the right to demand payment or that the corporation lacked the funds to pay them. <u>Heitz v. Commissioner</u>, <u>supra</u>; see also <u>Zimco Elec. Supply Co. v. Commissioner</u>, T.C. Memo. 1971-215.

After examining what little evidence the parties presented with respect to this issue, we conclude that Menards set apart

---

[73]The taxpayers in <u>Heitz v. Commissioner</u>, T.C. Memo. 1998-220, did not appeal our decision with respect to the constructive receipt of interest income.  See <u>Exacto Spring Corp. v. Commissioner</u>, 196 F.3d 833 (7th Cir. 1999).

- 95 -

the accrued interest, Mr. Menard could have demanded payment of the interest at any time, and Menards placed no substantial restrictions or limitations on Mr. Menard's receipt of the interest.  Mr. Menard constructively received interest income in 1998 and is liable for tax on the full amount of $639,302.

VI.  Section 6662(a) Accuracy-Related Penalties for Negligence or Disregard of Rules or Regulations

If any portion of an underpayment of tax required to be shown on a taxpayer's return is attributable to "negligence or disregard of rules or regulations", the taxpayer is liable for a penalty equal to 20 percent of that portion of the underpayment. See sec. 6662(a) and (b)(1).  "Negligence" includes a taxpayer's failure to "make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code]" and maintain adequate books and records or properly substantiate items. "Disregard" comprises "any careless, reckless, or intentional disregard".  Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs.

Respondent determined that Menards is liable for a section 6662(a) accuracy-related penalty for the TMI expenses deduction, and Mr. Menard is liable for a section 6662(a) accuracy-related penalty for the constructive dividend attributable to Menards's payment of the excess TMI expenses and the constructive receipt of interest income.  Pursuant to section 7491(c), respondent must

produce sufficient evidence indicating that imposition of the section 6662(a) accuracy-related penalties against an individual is appropriate.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Respondent has met this burden of production.[74] Petitioners now must demonstrate that respondent's determinations are incorrect.  Id. at 447.

Petitioners advance three arguments for both Menards and Mr. Menard against imposition of the section 6662(a) accuracy-related penalties:  (1) Petitioners' positions had a realistic possibility of being sustained on the merits; (2) the issues were complex or technical; and (3) petitioners had reasonable cause for their positions and assumed them in good faith.  We examine each one of petitioners' contentions in turn.

A.  Petitioners' First Theory

Section 1.6662-3(a), Income Tax Regs., shields a taxpayer from the section 6662(a) accuracy-related penalty, if certain exceptions apply.  One exception pertains to taxpayer positions that are "contrary to a revenue ruling or notice * * * issued by the * * * [Commissioner] and published in the Internal Revenue

_____

[74]The record amply demonstrates, among other things, that Menards's record keeping with respect to its payment of TMI's expenses was not adequate, that Mr. Menard's loans to Menards were payable on demand, that Menards had the financial ability to pay the accrued interest to Mr. Menard during TYE 1998, and that Mr. Menard failed to report the accrued interest on his 1998 tax return.

Bulletin". Sec. 1.6662-3(a), Income Tax Regs. The section
6662(a) accuracy-related penalty will not apply to such a
position where the position has a realistic possibility of being
sustained on its merits. Sec. 1.6662-3(a), Income Tax Regs.[75]

Petitioners have not indicated which revenue ruling or
notice, if any, their positions contradict. Accordingly, we
decline to give this argument further consideration.

B. Petitioners' Second Theory

Petitioners assert that the "voluminous record" and the
"mandatory national office review" of respondent's brief
illustrate the complex and technical nature of the issues. For
this reason, petitioners argue, the section 6662(a) accuracy-
related penalties do not apply.

Although we agree with petitioners that the state of the
record in this case suggests that the parties had difficulties
with the issues, we disagree that the three issues for which
respondent determined penalties are actually complex or technical
in nature. Menards's payments of both the TMI expenses and
interest accrued on Mr. Menard's loans to the company were
straightforward transactions. We reject petitioners' argument.

---

[75]Sec. 1.6694-2(b), Income Tax Regs. contains the realistic
possibility standard. See sec. 1.6662-3(a), Income Tax Regs.

C.  Petitioners' Third Theory

Section 6664(c)(1) provides an exception to the section 6662(a) accuracy-related penalty where the taxpayer shows reasonable cause for, and that the taxpayer acted in good faith with respect to, any portion of the underpayment.  See also sec. 1.6664-4(a), Income Tax Regs.  We determine reasonable cause and good faith on a case-by-case basis, taking into account all pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is the extent of the taxpayer's effort to assess the proper tax liability.  Id.

One application of this exception is to a taxpayer's reasonable reliance in good faith on the advice of an independent professional adviser as to the tax treatment of an item.  United States v. Boyle, 469 U.S. 241, 250 (1985); sec. 1.6664-4(b)(1), Income Tax Regs.  The taxpayer must show that (1) the adviser was a competent professional who had sufficient expertise to justify the taxpayer's reliance on him, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. See Sklar, Greenstein & Scheer, P.C. v. Commissioner, 113 T.C. 135, 144-145 (1999).

As to the first requirement, respondent has not attacked the competence or expertise of Mr. Stienessen, petitioners'

accountant and tax return preparer.  Moreover, nothing in the record suggests that petitioners were not justified in their reliance on Mr. Stienessen as a competent professional.

We next consider whether petitioners provided to Mr. Stienessen necessary and accurate information for completion of petitioners' tax returns.  Except for Mr. Stienessen's and Mr. Menard's general testimony that Mr. Stienessen had necessary and accurate information, petitioners did not present evidence on this point.

Although petitioners may have believed that they supplied to Mr. Stienessen all the information he needed, Mr. Stienessen clearly did not have necessary and accurate information with respect to the TMI expenses deduction and constructive dividend issues.  Menards's books and records did not separately identify the TMI expenses but, instead, lumped them together with Menards's own operating costs.  As a result, Mr. Stienessen was unable to properly assess whether Menards was claiming an unreasonable amount of the TMI expenses as a deduction and paying the excess as a constructive dividend to Mr. Menard.

Regarding the constructive receipt of interest income issue, at trial, Mr. Stienessen testified that he did not report the interest income on Mr. Menard's 1998 tax return because Mr. Menard was a cash basis taxpayer and received the check in 1999.

Petitioners have not shown, however, that Mr. Stienessen was aware that Menards placed no substantial restrictions or limitations on Mr. Menard's receipt of the interest during TYE 1998. Without knowing what information Mr. Stienessen had when he prepared petitioners' returns, we cannot conclude that petitioners gave him necessary and accurate information for reporting the interest income.

After concluding that Mr. Stienessen lacked necessary and accurate information for preparing petitioners' returns, we need not decide whether petitioners actually relied in good faith on Mr. Stienessen's judgment. Petitioners are liable for the section 6662(a) accuracy-related penalties for negligence or disregard of rules or regulations as follows: Menards is liable with respect to the TMI expenses deduction as disallowed, and Mr. Menard is liable with respect to the excess TMI expenses constructive dividend and the constructively received interest income.

We have considered the remaining arguments of both parties for results contrary to those expressed herein and, to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155.</u>

APPENDIX

## Petitioners' and Respondent's Experts' Common Measures of
## Comparison Group Companies' Profitability for TYE 1998

### Dr. Hakala's Measures

|  | Gross Revenue[1] | Revenue Growth[2] | Net Income[3] | Return on Equity[4] | Return on Assets[5] |
|---|---|---|---|---|---|
| Menards | $3.420 | 12.7% | $0.205 | 18.8% | 14.2% |
| Home Depot | 24.156 | 23.7 | 1.160 | 16.1 | 10.3 |
| Kohl's | 3.060 | 28.1 | 0.141 | 14.8 | 8.7 |
| Lowe's | 10.137 | 17.9 | 0.357 | 13.7 | 6.8 |
| Staples | 5.732 | 27.6 | 0.168 | 15.3 | 6.4 |
| Target | 27.757 | 9.4 | 0.751 | 16.7 | 5.3 |

### Mr. Rowley's Measures

|  | Net Sales[6] | Net Sales Growth[8] | Net Income[9] | Return on Avg. Equity[10] | Return on Beg. Equity[11] | Return on Avg. Assets[12] |
|---|---|---|---|---|---|---|
| Menards | $3.420 | 12.7% | $0.204 | 20.6% | 22.9% | 15.6% |
| Home Depot | 24.156 | 23.7 | 1.160 | 17.8 | 19.5 | 11.3 |
| Kohl's | 3.060 | 28.1 | 0.141 | 19.2 | 27.3 | 10.3 |
| Lowe's | 10.137 | 17.9 | 0.357 | 14.8 | 16.1 | 7.4 |
| Staples | [7]5.181 | 30.6 | 0.131 | 15.1 | 17.2 | 6.2 |
| Target | 27.757 | 9.4 | 0.751 | 19.6 | 20.7 | 5.5 |

[1]Gross revenue is total gross sales in billions, rounded to the nearest million, before the subtraction of sales costs.

[2]Revenue growth is the percent change in gross revenue from the preceding fiscal year.

[3]Net income in billions, rounded to the nearest million, was computed after taxes.

[4]Return on equity equals net income divided by shareholders equity and multiplied by 100 percent.

[5]Return on assets equals net income divided by total assets and multiplied by 100 percent.

[6]According to Menards's financial statements, these numbers are actually gross sales in billions, rounded to the nearest million.

[7]For the values of Staples's gross revenue, revenue growth, and net income in TYE 1998, a slight discrepancy existed between Mr. Rowley's and Dr. Hakala's expert reports. Neither party explained the discrepancy.

[8]According to Menards's financial statements, these numbers are actually gross sales growth.

[9]Net income in billions, rounded to the nearest million, was computed after taxes.

[10]Mr. Rowley did not explain how he arrived at these numbers for return on average equity.

[11]Mr. Rowley did not explain how he arrived at these numbers for return on beginning equity.

[12]Mr. Rowley did not explain how he arrived at these numbers for return on average assets.